2004 ME 125

**In re JAZMINE L. et al.**

Supreme Judicial Court of Maine.

Submitted on Briefs: April 27, 2004.
Decided: Oct. 1, 2004.

Maurice Porter, Norway, for appellant.

G. Steven Rowe, Attorney General, Gwendolyn D. Thomas, Asst. Attorney General, LouAnn Clifford, Asst. Attorney General, Augusta, for appellee.

Elizabeth S. Ray, Dixfield, Guardian ad Litem.

John S. Jenness Jr., South Paris, for mother.

Panel: SAUFLEY, C.J., and CLIFFORD, RUDMAN, DANA, ALEXANDER, CALKINS, and LEVY, JJ.

SAUFLEY, C.J.

[¶ 1] The father of Jazmine L., Jordan L., Michael L., and Nathaniel L. appeals from a judgment of the District Court (South Paris, *Lawrence, J.*) terminating his parental rights. He asserts that, as a matter of law, the findings supporting determination of his parental unfitness are insufficient to support the termination of his parental rights by the clear and convincing evidence required pursuant to 22 M.R.S.A. § 4055(1)(B)(2)(b) (2004). We agree and vacate the judgment.

## I. BACKGROUND

[¶ 2] The four children first entered preliminary protective custody in August 2001, when the youngest children, twin boys, were approximately nine months old. The mother, who suffered from a serious mental illness, had been the primary caretaker of the children. The father, who often worked odd hours to earn income, had been a provider rather than a caretaker. The preliminary protection order was uncontested. The parents and the Department of Human Services[1] stipulated to jeopardy and a jeopardy order issued in November 2001. Jeopardy was based on the mother's severe mental health crisis, evictions and homelessness during the previous three years, Jordan's lead poisoning, and an alleged sexual assault by a third person on Jazmine while in her parents' custody.

[¶ 3] The Department's efforts to reunify the children with their parents initially focused on the mother, with the father's approval. When the efforts with the mother appeared doomed, the court required the father and the Department to begin focusing on the father's own reunification efforts. By September 2002, the children had been in foster care for nearly a year, and the court, recognizing the need for expedition, ordered that the father and the Department develop a reunification plan by October 31, 2002.

[¶ 4] Although the delay in addressing the father's ability to care for his children was unfortunate, the court took pains to assure that the father had a reasonable opportunity to demonstrate improvement. The court noted that the father's failure to work previously toward a plan for reunification "was the result of a misunderstanding" and that:

> The parties agree that the past focus of reunification has been predominantly with the mother. In addition, reunification efforts have been hampered by multiple changes in caseworkers for the family.[2] The parties further agree that the father should be given an equal opportunity, for a limited period of time, to demonstrate that he is able to meet the basic needs of the children, as well as their emotional and developmental needs and any special needs.

[¶ 5] In November 2002, the father and the Department agreed to a reunification plan pursuant to 22 M.R.S.A. § 4041(1–A) (2004). This plan contemplated that the children would return to living with the

---

1. While this appeal was pending, the Legislature established the Department of Health and Human Services, which subsumed the Department of Human Services, effective July 1, 2004. P.L. 2004, ch. 689, § B–1. All events discussed in this opinion occurred before this change took effect.

2. At the hearing on the termination of parental rights petition, a Department supervisor testified that at various times responsibility for services to the family had been assigned to eight different caseworkers.

father at an apparently clean and sufficiently sized apartment the father had obtained. Unfortunately, a Department inspection of the apartment in January 2003 turned up lead paint, precluding visits in that setting and delaying further efforts at physical reunification. Shortly thereafter, the Department received the psychological evaluation of the father and the mother, and the Department petitioned for termination of both parents' parental rights in May 2003.

[¶ 6] At the hearing on the termination petition, Department allegations regarding the father's ability to parent focused primarily upon his inability to meet his children's emotional needs and his failure, over several months, to locate an adequate, lead paint free apartment in which to reunify with his children.

[¶ 7] In October 2003, the District Court issued an order terminating the parental rights of both parents. The termination of parental rights order regarding the mother was not seriously contested and is not subject to appeal.

[¶ 8] With regard to the father, the court concluded that he was unwilling or unable to protect the children from jeopardy and that those circumstances were unlikely to change within a time reasonably calculated to meet the children's needs. 22 M.R.S.A. § 4055(1)(B)(2)(b)(i). The court also found that termination of parental rights was in each child's best interest. 22 M.R.S.A. § 4055(1)(B)(2)(a) (2004). The court's findings were thoughtful and comprehensive, and we therefore recite several of the findings that are central to this appeal.

Mr. [L.'s] parenting style lacks an emotional connection with his children. Such emotionally vacant parenting is problematic for children whose lives have been disrupted as much as has been true for the [L.] children. As Mr. [L.'s] emotional remoteness is so firmly rooted in his personality traits, it is unlikely that he would be able to demonstrate change in his emotional functioning, even if he participates in general ongoing therapy. Mr. [L.] would need to engage in intensive work on his functioning in the emotional realm of parenting and he would need to learn and understand that his emotionally closed personality style does not promote his children's sense of emotional safety and security. The psychological data, however, reflects a poor prognosis that Mr. [L.] can make such changes because successful psychotherapeutic intervention is not likely for someone with his personality style.

. . . .

The unresolved psychological and mental health issues of Mrs. [L.] and Mr. [L.] continue to pose a risk of serious mental/emotional harm to the children. In view of Mrs. [L.'s] refusal to engage in the intensive therapy necessary for her to achieve sufficient emotional stability to adequately parent any of the children, Mrs. [L.'s] unexplained failure to attend the hearing on the Petition to Terminate Parental Rights, and the dim prospects for the provision of further services to Mr. [L.] to enable him to engage his children emotionally and adequately meet their emotional needs, the court finds that neither Mrs. [L.] nor Mr. [L.] has made significant progress in correcting the conditions that led to the original finding of jeopardy.

[¶ 9] Because the Department had planned to return the children to live with the father before his psychological evaluation was completed, and because the court recognized that at least some of the factors inherent in the housing delay were created simply by the difficulties in obtaining lead paint free housing, it is evident that the

court found the real impediment to the father's ability to care for his children as springing from his inability to "adequately meet their emotional needs."

[¶ 10] The court's conclusion is summarized in its statement that (1) the father's "emotionally vacant parenting is problematic for children whose lives have been disrupted as much as has been true for the [L.] children," and (2) the father's "emotional remoteness is so firmly rooted in his personality traits, it is unlikely that he would be able to demonstrate change in his emotional functioning, even if he participates in general ongoing therapy."

[¶ 11] We must decide whether the evidence and the court's findings are, as a matter of law, sufficient to support a finding of parental unfitness, by clear and convincing evidence, to justify final and irrevocable termination of the father's parental rights to his children.

## II.  LEGAL ANALYSIS

■ [¶ 12] In reviewing the evidence presented in support of a termination of parental rights, we are mindful of two overriding principles. First, the parental interest in maintaining the parent-child relationship is one of the most fundamental liberty interests protected by our constitution. It was recognized most recently by the United States Supreme Court in *Troxel v. Granville*, 530 U.S. 57, 65–66, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000). We have also recognized the importance of this fundamental liberty interest. *See, e.g., In re Alana S.*, 2002 ME 126, ¶ 16, 802 A.2d 976, 980; *In re Scott S.*, 2001 ME 114, ¶ 20 & n. 12, 775 A.2d 1144, 1151; *Rideout v. Riendeau*, 2000 ME 198, ¶ 12, 761 A.2d 291, 297. Requiring findings of parental unfitness to a high probability, the clear and convincing evidence standard, recognizes this fundamental liberty interest. 22 M.R.S.A. § 4055(1)(B)(2)(b).

■ [¶ 13] Second, we recognize that the trial court has the unique advantage of observing the witnesses and assessing opportunities offered to the parents and the parents' commitment to the care and safety of their children. In the best of circumstances, the same trial judge will have worked with the family through most of the proceedings. Thus, we view the facts, and the weight to be given individual facts, through the trial court's lens. *See In re Charles G.*, 2001 ME 3, ¶ 5, 763 A.2d 1163, 1165–66. This makes it all the more important that the trial court make specific findings of fact to inform the parties and our appellate review of the basis for the termination decision and the evidence the court relied on in reaching its result. *See In re Dylan B.*, 2001 ME 31, ¶ 4, 766 A.2d 577, 578; *In re Kenneth H.*, 1997 ME 48, ¶¶ 3–5, 690 A.2d 984, 985; *In re Amber B.*, 597 A.2d 937, 938 (Me.1991). The findings of the trial court in this instance are thorough. We therefore review the sufficiency of the evidence based on those findings. *In re Charles G.*, 2001 ME 3, ¶ 5, 763 A.2d at 1165–66.

[¶ 14] Turning to the law at issue, there are four instances of parental unfitness upon which a court may determine that termination of parental rights is warranted. 22 M.R.S.A. § 4055(1)(B)(2)(b)(i)–(iv). Here, the court concluded that the father's unfitness was proven under the jeopardy prong, subparagraph (i): "The parent is unwilling or unable to protect the child from jeopardy and these circumstances are unlikely to change within a time which is reasonably calculated to meet the child's needs." *Id.* Accordingly, the statutory definition of jeopardy provides the basic guide for determining parental unfitness necessary to trigger termination of this father's parental rights. "Jeopardy" means:

serious abuse or neglect, as evidenced by:

**A.** Serious harm or threat of serious harm;

**B.** Deprivation of adequate food, clothing, shelter, supervision or care, including health care when that deprivation causes a threat of serious harm;

**C.** Abandonment of the child or absence of any person responsible for the child, which creates a threat of serious harm; or

**D.** The end of voluntary placement, when the imminent return of the child to his custodian causes a threat of serious harm.

22 M.R.S.A. § 4002(6) (2004). The jeopardy referenced by the court regarding this father fell under paragraph A, "[s]erious harm or threat of serious harm." Notably for a jeopardy determination, harm to a child, or abuse or neglect must be "serious." The "serious harm" identified in the findings is that defined in section 4002(10) as:

Serious mental or emotional injury or impairment which now or in the future is likely to be evidenced by serious mental, behavioral or personality disorder, including severe anxiety, depression or withdrawal, untoward aggressive behavior, seriously delayed development or similar serious dysfunctional behavior
. . . .

22 M.R.S.A. § 4002(10)(B) (2004).

■ [¶ 15] As is clear from the above definitions, the focus in determining the presence of parental unfitness must be on the consequent harm to the children, not simply the deficits of parents. In some instances—sexual abuse, physical assaults, abandonment—the harm may be presumed from the parental deficit. The relationship to harm when the asserted parental deficit is alleged to cause *emotional* harm may, however, be less apparent. Accordingly, the Legislature has required that the existence of the emotional harm or threat of emotional harm be of sufficient severity that, now or in the future, it is "likely to be *evidenced* by serious mental, behavioral or personality disorder." 22 M.R.S.A. § 4002(10)(B) (emphasis added). That disorder may manifest itself through "severe anxiety, depression or withdrawal," or other dysfunctional behavior, *id.*, but *there must be evidence* of the likelihood of the disorder or threat of that disorder.

■ [¶ 16] Moreover, because the ultimate determination in these cases must turn on the parent's ability to meet the child's needs, the focus of these statutory standards is, and must be, on the *relationship* between the parent's abilities and the child's needs. Evidence of the parent's deficits or inadequacies will inform the court of the parent's capabilities. Evidence of the child's individual vulnerabilities or specific problems will demonstrate the child's needs. The two must then be connected by evidence demonstrating the relationship between the parent's skills and the parent's ability to address and meet the child's needs. For a court to be persuaded that a parent is unable or unwilling to protect a child from jeopardy, the court must not only have evidence of the parent's own deficits or inadequacies, but must also have evidence of the effect of those inadequacies on meeting the child's needs.

■ [¶ 17] Here, the trial court received evidence of the father's parenting deficits, specifically related to his emotionally vacant parenting style. The court found that the father was a "highly sensitive, suspicious and distrustful person" who had a "strong tendency" to avoid intimate relationships and had little ability "to under-

stand and express his emotional state." The father was viewed as lacking insight into his own feelings and insight into the feelings and needs of his children and "at high risk of not having empathy in his interactions with his children." The court's findings on these points were amply supported by the evidence.

[¶ 18] It is the next step in the analysis that is missing in this case: connecting those parenting deficits to the current needs of the specific children at issue.

[¶ 19] Although the evidence was undisputed that the children had suffered significant emotional harm before settling into stable foster parent homes, the children's current emotional and psychological needs were left essentially unaddressed in this record. More specifically, the probable effect of the father's parenting deficits on these children was not addressed. The court was simply not provided evidence addressing the severity of the emotional or psychological harm the children would likely experience if they are reunited with their father.

[¶ 20] Although the record could support an inference that the children will experience emotional upset or even emotional harm during a period of reintegration into their father's home, it does not provide a basis for assessing the threat or severity of that harm. This missing evidence is all the more important in light of two other facts. First, the harm originally suffered by the children was generated in great part from their mother's mental illness and the turmoil created by that upheaval in their lives. The father had not been a primary care provider for the children in the past. Second, the Department planned to place the children with their father until the lead paint problem reoc-

curred and the latest psychological evaluation of the father arrived. In other words, it was not readily apparent even to the Department that the father could not care for his children. Because the psychological evaluation did not contain evidence of the needs or the threat of harm to these specific children from their father, that evaluation was not, in itself, sufficient to form the evidentiary foundation for the termination.

[¶ 21] Ultimately, in circumstances where the concerns regarding harm to the children are based upon emotional harm, evidence that permits the trial court to assess the severity of emotional or psychological harm—whether from lay or expert witnesses—is essential because the statute requires clear and convincing evidence of "[s]erious mental or emotional injury or impairment" to the child or children. 22 M.R.S.A. § 4002(10)(B) (emphasis added). Absent such evidence, the court is left to speculate whether the perceived harm will, in fact, constitute serious mental or emotional injury or impairment.

[¶ 22] Here, the court's findings that the father suffers from parenting deficits were amply supported by the record. However, whether those deficits would in fact subject these children to the threat of serious emotional harm is not sufficiently clear and convincing on this record to support the final determination that parental rights must be terminated.[3]

The entry is:

Judgment terminating the father's parental rights vacated.

---

3. We do not order any specific process on remand. The passage of time, the fluidity of the children's needs, and the possibility of parental improvement must be considered in developing that process, and we leave the determination of the next steps to the sound discretion of the trial court.