2005 ME 2

**In re DAKOTA P. et al.**

Supreme Judicial Court of Maine.

Submitted On Briefs: Nov. 3, 2004.

Decided: Jan. 5, 2005.

Donna L. Martin, Esq., David Q. Whittier, P.A., South Paris, for appellant.

G. Steven Rowe, Attorney General, Matthew Pollack, Asst. Atty. Gen., Lou Ann Clifford, Asst. Atty. Gen., Augusta, for appellee.

Elizabeth Ray, Esq., Dixfield, Guardian ad Litem.

Thomas Dean, Esq., Farmington, Maurice Porter, Esq., Norway, for fathers.

Panel: SAUFLEY, C.J., and CLIFFORD, RUDMAN, DANA, ALEXANDER, and LEVY, JJ.

LEVY, J.

[¶ 1] The mother of Dakota P., Kerry G. III, Kaylee G., and Dominik P., appeals from the judgment of the District Court (Rumford, *McElwee, J.*) concluding that her children were in jeopardy and granting custody to the Department of Human Services.[1] The mother contends that (1) the court erred in concluding that she received proper notice of the child protection proceeding; (2) the court lacked personal jurisdiction; (3) the court erred in finding that the Department of Human Services made reasonable efforts to prevent the removal of the children from her home; and (4) the evidence was insufficient to support the conclusion that she had placed the children in circumstances of jeopardy as evidenced by serious abuse or neglect pursuant to 22 M.R.S.A. § 4002(6) (2004). Because we conclude that the evidence was insufficient to support the court's jeopardy finding, we vacate the judgment and remand for further proceedings.

## I. BACKGROUND

[¶ 2] Between her eighteenth and twenty-third birthdays, the mother gave birth to five children with four different fathers.[2] The Department first became involved

---

1. In 2004, the Legislature established the Department of Health and Human Services, which has subsumed the Department of Human Services and the Department of Behavioral and Developmental Services. P.L.2004, ch. 689 (effective July 1, 2004).

2. In addition to DHS and the mother, the following individuals were parties to the jeopardy proceeding: Kyle F., the mother's husband and Dominik's father; and Kerry G. II, the mother's ex-husband and father of Kaylee and Kerry III. Billy S., Dakota's putative father, was not present at the hearing, and his location remains unknown. Kyle and Kerry II stipulated that they were unable to adequately care for and supervise their children. All references to "Kerry" in this opinion refer to the child Kerry III, and not the father Kerry II. Only the mother appeals from the jeopardy order.

with the family in October 2000 after the mother filed a request for a protection from abuse order on behalf of her first son, Nathaniel R., against his father, Adam R. Shortly thereafter, in November 2000, Nathaniel and Adam died in a fire in Adam's house. The Department continued its involvement with the mother over the next few years.

[¶ 3] In August 2003, after spending the weekend at his father's house, Kerry, then age two, returned to his mother with a red and blistered toe. The mother took him to the emergency room, where he was bandaged and given antibiotic ointment. Kerry's infection worsened, and he was subsequently hospitalized for a period of time during which a portion of his toe was amputated. While hospitalized, Kerry developed a staph infection and pneumonia.

[¶ 4] Shortly thereafter, Dakota, then age three, was injured while the family was staying at a cousin's house. An adult relative had been taking care of the children while the mother was out shopping. When the mother returned to the house, Dakota ran out onto a second-floor porch, slipped through several broken slats on the porch railing, and fell two stories to the ground below. Dakota suffered a broken jaw and other injuries, and was hospitalized.

[¶ 5] At about the same time, the mother received a $75,000 insurance settlement for Nathaniel's death. She used the money to purchase appliances and personal items, and she testified that she "loaned" $6000 to her landlord in Rumford to secure the right to live in her apartment for two years. At this time the mother also married Kyle F., only to separate shortly thereafter. The mother then left Kyle in possession of the Rumford apartment and moved with the children to Winslow to find a job, despite having no connections there.

[¶ 6] In September 2003, the Department filed petitions for child protective orders, requesting preliminary protection orders. The Department alleged that the children were in circumstances of jeopardy and were in need of protection because of their parents' neglect and their failure to meet their children's needs for medical care. The court entered preliminary protection orders and held final child protection hearings over four days between December 2003 and March 2004.

[¶ 7] The court found the children to be in jeopardy, citing the injuries suffered by Kerry and Dakota as constituting "neglect evidenced by serious harm to those particular children, Kerry and Dakota, and that it's a threat of serious harm to any children in her custody in and around that same period of time." In addition, the court found:

> [The mother] suffers from depression, PTSD [ (Post Traumatic Stress Disorder) ], substance abuse, and possibly Factitious Disorder. As a result of being overwhelmed with responsibility and suffering from personal disabilities, [the mother] was unable to properly attend to her children, despite her best efforts to do so. [The mother] attempted to provide the children necessary medical care and appropriate supervision. However, on numerous occasions, she was not successful in her efforts.

The court also found that the mother exhibited poor judgment in decisions she made concerning her insurance settlement, her marriage to and separation from Kyle, and her move to Winslow. The court entered its jeopardy order in April 2004, granting the Department custody of all four children and ordering that the parties engage in reunification efforts. This appeal followed.

## II.  DISCUSSION

### A.  Jurisdiction and Notice of the Child Protection Proceeding

■ [¶ 8] The mother contends that the court erred in concluding that she received proper notice of the child protection proceeding and, as a consequence, that the court lacks personal jurisdiction.  When the Department intends to request a preliminary protection order, it must, "by any reasonable means, attempt to notify the parents and custodians of [its] intent to request that order and of the time and place at which [it] will make the request." 22 M.R.S.A. § 4033(2) (2004).  During the final jeopardy hearing, the mother filed a motion to dismiss the case for improper service because of the Department's failure to notify her of its intent to file petitions for the child protection orders.

[¶ 9]  Department caseworker Leora Johnson testified that she was aware of her statutory duty to inform the parents of her intention to file the preliminary petitions and that she attempted to notify the mother, but that she could not find her.[3] The mother asserts that the Department knew she was at the hospital and therefore could not have attempted to notify her of the petition.

■ [¶ 10] Despite the mother's suggestion that Johnson knew where she was, Johnson testified that she could not find her.  Moreover, any deficiency in the notice was cured by the mother's written waiver of the summary preliminary hearing and her consent to the preliminary protection order.  *See Thompson v. Perkins*, 57 Me. 290, 292 (1869) (holding that a party "cannot except to a ruling made with

his consent, however erroneous").  A temporary deprivation of parental rights without notice and a hearing does not violate due process where the parents are subsequently entitled to a hearing.  *See In re Amberley D.*, 2001 ME 87, ¶ 12, 775 A.2d 1158, 1163 (citing 18–A M.R.S.A. § 5–212 (1998)).  Here, the mother not only had the opportunity to be heard at the jeopardy hearing, but she also had the opportunity to be heard at the summary preliminary hearing, which she waived.  Accordingly, the court properly exercised its jurisdiction in this case.

### B.  Appellate Review of the Court's "Reasonable Efforts" Determination

■ [¶ 11] Title 22 M.R.S.A. § 4036–B(3) (2004) provides that the "department shall make reasonable efforts to prevent removal of the child from home, unless the court finds the presence of an aggravating factor."  The mother argues that the Department failed to make reasonable efforts to prevent removal of her children from her home in violation of this section.  The Department, on the other hand, questions whether the section 4036–B(3) reasonable efforts requirement presents an appealable issue, arguing that "the timing of these findings is not linked to the jeopardy order."

[¶ 12] Appeals in child protective cases are limited to those arising from jeopardy orders, termination orders, and medical treatment orders.  33 M.R.S.A. § 4006 (2004).  All other orders entered under the Child and Family Services and Child Protection Act "are interlocutory and are not appealable."  *Id.*

---

**3.**  The petitions for the child protection order contain a check-the-box notification provision pursuant to 22 M.R.S.A. § 4033(2) (2004). Johnson testified that she mistakenly checked the box stating, "Notice of the Petitioner's intent to request a Preliminary Order has been given to the Parent(s)."  She intended, however, to check the box indicating that "[n]otice has been attempted without success to parent(s)."

[¶ 13] The court's reasonable efforts determination was first made in its order of preliminary child protection, and a subsequent reasonable efforts finding was made in the final jeopardy order. The mother's challenge to the court's ultimate reasonable efforts finding, therefore, is one that arises from a jeopardy order and is properly the subject of appellate review under section 4006.

■ [¶ 14] The court found that the Department "made reasonable efforts to prevent the need to remove the children from the custody of their parents," including "safety assessment and planning; referrals for evaluations, parenting education and counseling; [and] DHS social worker services." Although the mother points out that Johnson never offered her certain specific services before filing the petition for child protection, the court was not compelled to conclude that this alone rendered the Department's efforts unreasonable. The record reflects that the Department was involved with and offered assistance to the mother for three years prior to the filing of the petition. Accordingly, the court did not err in finding that the Department made reasonable efforts to prevent the removal of the children from the mother's home.

## C. Sufficiency of the Evidence

■ [¶ 15] "When reviewing a challenge to the sufficiency of the evidence on an appeal of a final child protection order, we will not disturb the District Court's findings unless such findings are clearly erroneous." *In re Dorothy V.,* 2001 ME 97, ¶ 12, 774 A.2d 1118, 1122. A court's entry of a jeopardy order must be supported by a preponderance of the evidence. 22 M.R.S.A. § 4035(2) (2004). "We must uphold the findings, therefore, 'if any evidence in the record can rationally be read to establish,' as more likely than not, that

[the children were] in circumstances of jeopardy to [their] health and welfare." *In re Dorothy V.,* 2001 ME 97, ¶ 12, 774 A.2d at 1122 (quoting *In re Chesley B.,* 499 A.2d 137, 139 (Me.1985)). Jeopardy means:

serious abuse or neglect, as evidenced by:

A. Serious harm or threat of serious harm;

B. Deprivation of adequate food, clothing, shelter, supervision or care, including health care when that deprivation causes a threat of serious harm;

C. Abandonment of the child or absence of any person responsible for the child, which creates a threat of serious harm; or

D. The end of voluntary placement, when the imminent return of the child to his custodian causes a threat of serious harm.

22 M.R.S.A. § 4002(6).

### 1. Kerry's and Dakota's Injuries

■ [¶ 16] The court concluded that Kerry's and Dakota's injuries were proof by a preponderance of the evidence of a risk of serious harm to all four children. In its oral findings made on the record, however, the court also found that the mother was not responsible for the circumstances resulting in Kerry's and Dakota's injuries:

It's possible that in any given case, those two [accidents] could be isolated as an unfortunate coincidence or convergence of events, and that absolutely no action by the [D]epartment would be appropriate. That isn't what happened here. What happened here, when [the Department] waded into this case, was they found two children with very serious harm, the effects of the infected toe, which the Court finds received proper

medical care, but, unfortunately, the record, the Court finds, would indicate didn't receive appropriate care or referral back to doctors soon enough, with intervening periods of recuperation, and then the tragic fall that Dakota suffered. No fault whatsoever of [the mother] in a direct or intentional sense. But she was overwhelmed, dealing with Kerry's situation, her other children, and left her child in a situation where that took place. It was an accident. It wasn't anything that she would have wished on anything. It wasn't anything she could have anticipated. But it happened.

Furthermore, although the court found that the mother "took [her] kids to the doctor a whole lot," it also found that there were "one or two specific [missed appointments] that might have changed the prognosis with regard to [Kerry's] toe injury."

[¶ 17] The fact that the mother was "overwhelmed" and that Kerry and Dakota both suffered serious injuries cannot serve as a predicate for the court's jeopardy finding because the evidence did not establish Kerry's and Dakota's injuries were a consequence of the mother being overwhelmed by her parental responsibilities. At the end of an August 15 appointment, a physician's assistant instructed the mother to bring Kerry in for a follow-up visit two weeks later on August 29. The treating physician testified, however, that he would

have preferred for the mother to have been instructed to return with Kerry in two days, not two weeks. The mother missed the August 29 appointment and instead returned with Kerry on September 2. The testimony of the medical witnesses did not suggest the four-day delay in the follow-up appointment made a difference in Kerry's toe's condition.[4] With regard to Dakota's fall, the court specifically found that "[i]t wasn't anything [the mother] could have anticipated," and nothing in the record indicates that the adult relative who was taking care of Dakota was an inappropriate choice for a babysitter.

[¶ 18] The court's findings regarding Kerry's and Dakota's injuries do not support the conclusion that the injuries or the medical care associated with them evidence that the mother poses a risk of serious harm to her children.

### 2. The Mother's Financial Misjudgment

■ [¶ 19] The Department contends that the mother's irresponsible financial decisions also support the court's jeopardy determination. Nevertheless, despite its discussion of the mother's poor financial judgment, the court did not connect the mother's decisions with actual or threatened abuse or harm to the children. Regarding the $6000 the mother spent on the Rumford apartment, for example, the

---

4. A nurse practitioner testified that the mother initially brought Kerry to the Rumford Hospital emergency room on August 10 and 11, 2003. Dr. Guy Nuki, a physician at Central Maine Medical Center, testified that the mother brought Kerry in for a scheduled follow-up appointment on August 15. Dr. Nuki stated that he would have recommended that Kerry return two days later, but at the end of that appointment, the mother was told instead by a physician's assistant to bring Kerry back in two weeks for an appointment on August 29. The mother missed the August 29 appointment and brought Kerry in for a follow-up visit on September 2. Dr. Nuki was asked whether the missed appointment made "the big difference with how the toe—" and he responded "[n]o." He was then asked, "So, it didn't affect it negatively one way or the other?" The trial transcript reflects that his response was inaudible. In closing argument, the mother's attorney asserted that "Dr. Nuki ... stated that [the mother] had done everything she could, and that, in his opinion, she could not have done more than she did." The Department's attorney did not address this issue in her closing statement.

court stated, "It's not a conclusive issue on jeopardy, and it simply muddies the matter of disposition, reunification and treatment." In discussing the mother's expenditure of the remainder of the insurance settlement, the court stated, "In light of the number of children that she had, her parental responsibilities and the fact that that money was dissipated in such a short period of time, [it] only serves as significant evidence of the Court's conclusion regarding her level of maturity and ability to understand the scope of her parental responsibilities."

[¶ 20] The court properly considered evidence of the mother's poor financial judgment as offering insight into her lack of maturity, and as primarily relevant to the issues of disposition, reunification, and treatment. The findings do not establish, however, that the mother's poor financial judgment deprived the children of essential care or services, or that she has caused or will cause the serious abuse or neglect of her children.

### 3. The Mother's Disabilities

[¶ 21] The court also found that the mother's personal disabilities rendered her unable to meet her children's needs:

> [The mother] suffers from depression, PTSD, substance abuse, and possibly Factitious Disorder. As a result of being overwhelmed with responsibility and suffering from personal disabilities, [the mother] was unable to properly attend to her children, despite her best efforts to do so. [The mother] attempted to provide the children necessary medical care and appropriate supervision. However, on numerous occasions, she was not successful in her efforts.

### a. Depression and PTSD

[¶ 22] The record supports the court's findings that the mother suffers from depression and suffered from PTSD in connection with Nathaniel's death in November 2000. There was, however, little evidence suggesting that her depression or PTSD renders her unfit to care for the children.

[¶ 23] Dr. Guy Nuki, a physician at the Central Maine Medical Center family practice clinic, testified that the mother suffered from "chronic depression, which is exacerbated in the postpartum period" and that she was being treated with Zoloft. He added that she has "never exhibited any signs of self-harm or . . . evidence that she would harm her children, or anyone around her." It was his opinion that her depression did not render her incapable of taking care of her children.

[¶ 24] At the Department's request, the mother participated in a psychological and substance abuse evaluation administered by Dr. Kathryn Thomas. Based on her diagnostic interview and testing, Dr. Thomas testified that the mother did not have "any significant mental health issues that [came] out through testing." In addition, Dr. Thomas "didn't see any issues that would prevent [the mother] from being able to parent."

### b. Factitious Disorder

[¶ 25] Similarly, the evidence did not establish that the mother possibly suffers from factitious disorder, a psychological disorder involving a person's purposeful production of symptoms in an attempt to get attention. Dr. Thomas testified that her testing did not identify the mother as suffering from factitious disorder. Moreover, no other testimony supports the finding that the mother has been diagnosed as possibly suffering from factitious disorder.[5]

5. The Guardian ad Litem asserted in her clos-      ing argument that the mother possibly suffers

### c. Substance Abuse

[¶ 26] Dr. Thomas's report stated that the mother "does not appear to have a substance dependence disorder, though there is some concern that without appropriate intervention she could be on the road to more serious substance abuse." The record indicates that the mother did drink alcohol to excess on several occasions when she was not caring for the children, but it does not support the view that she regularly consumes or abuses alcohol or that her use of alcohol poses a threat of serious harm to her children.[6]

### d. Conclusion Regarding Mother's Disabilities

[¶ 27] The evidence associated with the court's findings regarding the mother's disabilities is not sufficient to support the conclusion that her condition has resulted or may result in a "[d]eprivation of adequate . . . supervision or care, including health care" that will "caus[e] a threat of serious harm" to the children. 22 M.R.S.A. § 4002(6)(B). There are certainly some parents who, as a consequence of suffering from depression, may become so overwhelmed by their responsibilities as to be rendered unfit to parent. The law does not presume, however, that a parent's clinical depression, PTSD, or other psychopathology gives rise to jeopardy. In *In re Jazmine L.*, we made it clear that in child protective cases it is not enough to establish an individual's "parenting deficits"; there must also be evidence that estab-

lishes a connection between those "parenting deficits" and jeopardy to the children. 2004 ME 125, ¶¶ 18–19, 861 A.2d 1277, 1282. Where, as here, there is insufficient evidence establishing such a connection, we are "left to speculate whether the perceived harm will, in fact, constitute [jeopardy]." *Id.* ¶ 21, 861 A.2d at 1281.

[¶ 28] Because we conclude that the record evidence does not support the findings regarding the mother's disabilities and does not establish a connection between her conditions and a threat of serious harm to the children, the court erred in basing its jeopardy finding on the mother's disabilities.

### D. Failure to Provide Necessary Medical Care and Supervision

[¶ 29] The court emphasized in both its oral and written findings that two of the reasons for its jeopardy finding were the mother's relative immaturity and her being overwhelmed by the responsibility of raising four children, all under the age of five, two of whom have special medical needs.[7] It found that on "numerous occasions" she was unsuccessful in providing the children "necessary medical care and appropriate supervision," and that this resulted not only from her "personal disabilities," but also from her "being overwhelmed with responsibility."

[¶ 30] The deprivation of adequate supervision or care, including health care, constitutes jeopardy "when that deprivation causes a threat of serious harm." 22

---

from factitious disorder and should be subjected to additional psychiatric testing. Because closing argument is not evidence, this assertion alone cannot support the resulting finding.

6. Kerry's father testified that during the five- or six-year period he had known the mother, she had become intoxicated "on occasion." He added that she had become intoxicated once or twice after Kaylee's birth in May 2002. When asked whether she had become intoxicated while caring for her children, he answered, "I couldn't honestly tell you, I think so, at a couple of times."

7. The court found that Kerry was born with a serious heart condition, and that Kaylee has a "significant breathing disorder history."

M.R.S.A. § 4002(6)(B); *see also In re Adrian D.*, 2004 ME 144, ¶ 11, 861 A.2d 1286, 1289. We conclude that the court's findings regarding Kerry's and Dakota's injuries, the mother's financial misjudgment, and the mother's personal disabilities are insufficient to support the court's jeopardy determination. The court did not render specific findings regarding the "numerous occasions" the children were deprived of medical care and supervision, separate from its findings associated with Kerry's and Dakota's injuries and hospitalizations. We cannot, therefore, determine whether it would have found jeopardy based exclusively on the deprivation of medical care and supervision unrelated to Kerry's and Dakota's injuries.

[¶ 31] Accordingly, although we vacate the judgment, we remand this matter for the trial court to review the record solely on the issues of (1) whether the mother failed on numerous occasions to provide the children necessary medical care and supervision, and (2) whether those deprivations give rise to a threat of serious harm constituting jeopardy. On remand, the court must reexamine the record and "independently determine the facts anew." *In re Heather G.*, 2002 ME 151, ¶ 14, 805 A.2d 249, 253.

The entry is:

Jeopardy order vacated. Case remanded for further proceedings consistent with this opinion.