MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:      2014 ME 59
Docket:        Yor-12-440
Argued:        May 15, 2013
Decided:       April 17, 2014

Panel:         SAUFLEY, C.J., and ALEXANDER, LEVY, SILVER, MEAD, GORMAN, and JABAR,
               JJ.
Plurality:     SAUFLEY, C.J., and MEAD, and GORMAN, JJ.
Concurrence:   SILVER and JABAR, JJ.
Dissent:       ALEXANDER and LEVY, JJ.

MATTHEW W. PITTS

v.

AMANDA M. MOORE

GORMAN, J.

[¶1]  Amanda M. Moore appeals from a judgment entered in the District Court (Springvale, *Darvin, J.*) finding that Matthew W. Pitts is her child's de facto parent and its award of contact on that basis.  We take this opportunity to provide guidance to parties and courts grappling with claims by persons asking to be identified as de facto parents, and vacate the judgment and remand the matter to the District Court for further proceedings.

I.  BACKGROUND

[¶2]  Pitts and Moore dated and lived together on an "on again, off again" basis for more than eight years.  While separated from Pitts in 2008, Moore dated Eric B. Hague for a few months.  Soon after, Pitts and Moore resumed their

2

relationship, and Moore learned that she was pregnant. The child was born in November of 2009. By mid-2011, Pitts's and Moore's relationship had ended.

[¶3]  The present litigation began in July of 2011, when Pitts filed a complaint in the District Court against Moore seeking parental rights and responsibilities concerning the child. In her response, Moore asserted that Pitts was not the child's biological father, and, after paternity testing was completed, Pitts stipulated to that fact. On the parties' stipulation, the matter thus proceeded as one of asserted de facto parenthood.[1]

[¶4]  After a testimonial hearing, the court made the following findings of fact, all of which are supported by substantial evidence in the record. Although Moore and Pitts were unsure of the child's paternity, they decided to identify Pitts as the father. During Moore's pregnancy, Pitts attended some prenatal appointments and a birthing class, and was present at the hospital for the child's birth. Moore and Pitts agreed to name Pitts as the father on the child's birth certificate, and to give the child Pitts's last name.

[¶5] Pitts, Moore, and the child lived together from November of 2009 until November of 2010, with a one-month separation in June of 2010. From the child's

---

[1] This matter was consolidated with a protection from abuse matter between Moore and Pitts, which Moore later dismissed. It was also consolidated with Moore's action for parental rights against Hague, the child's biological father; a separate judgment was issued in that matter. Neither of these two other actions is before us.

birth, Moore was the child's primary caretaker. Pitts was the sole source of financial support for the household for the first seven months of the child's life; from then on, Moore also worked, but Pitts remained the primary wage earner. The court found that Pitts's "involvement with the child was more focused on playtime, with occasional feeding and less occasional bathing and changing of [diapers]." Pitts believed that because he was the primary wage earner, Moore was primarily responsible for caring for the child, but Pitts did take care of the child when Moore was not home.

[¶6] After Pitts and Moore separated, Pitts and Pitts's family had regular contact with the child, including multiple visits each week and an occasional overnight visit. In April of 2011, Pitts and Moore attempted to reconcile, and Pitts again spent significant time with the child in the family household. In May, however, the parties had an argument after which Moore filed a protection from abuse complaint against Pitts; Pitts was prohibited from seeing the child during the month following the filing. After that, Pitts had "mostly consistent" contact with the child consisting of supervised contact for five hours each Sunday pursuant to an interim parental rights order.

[¶7] Hague is the child's biological father. He is on active duty in the military and stationed in Wisconsin, where he lives with his wife, son, and two stepchildren. He has met this child twice for a total of a few hours. Hague

4

testified that he wishes to be a father to the child, and he and Moore want the child to know Hague as his "real father." He plans to visit Maine a few times each year during the summer and holidays. Moore and Hague do not want Pitts to have any contact with the child, but the court found that neither has considered how to introduce Hague into the child's life, the impact of Hague's introduction on the child, or how the removal of Pitts and his family from the child's life would affect the child.

> [¶8] The court found that Pitts

> has made an unequivocal permanent commitment to the child and considers him to be his son . . . . The child has formed a bond of attachment with [Pitts] and his family. A complete disruption of that bond would have an adverse impact on the child. However, the testimony and evidence was not sufficient for the court to quantify the impact that removal of [Pitts] and his family from the child's life will have, nor to make any finding as to the duration of said adverse impact.

Based on this language and its other findings, the court determined that Pitts is the child's de facto parent and that continued contact with Pitts is in the child's best interest. Other than the right to have unsupervised contact with the child, the court did not award to or impose on Pitts any parental rights or responsibilities, including any decision making power or the duty to pay child support.[2]

---

[2] The court denied Moore's motion to end Pitts's contact with the child pending appeal. *See* M.R. Civ. P. 62, 121.

[¶9]   Moore timely appeals, arguing that the judgment is erroneous as a matter of fact and law; she asserts that Pitts's role in the child's life has been short, inconsistent, and devoid of the daily caretaking functions that characterize a de facto parent; that Pitt's removal from the child's life will cause no trauma to the child; and that the amount of time the court awarded Pitts was inappropriately generous because it intrudes on the parent-child relationship between Moore and the child, and between Hague and the child.  We review the court's findings of fact for clear error, its conclusions of law de novo, and its ultimate award of visitation for an abuse of discretion.  *Grant v. Hamm*, 2012 ME 79, ¶ 6, 48 A.3d 789; *Philbrook v. Theriault*, 2008 ME 152, ¶ 21, 957 A.2d 74.

## II.  DISCUSSION

[¶10]   For some time now, we and other courts have been considering the law of parentage in light of advancements in technology, changes in social norms and family structures, and the resulting ever-expanding list of legal issues relating to children and families.  *See, e.g.*, *Nolan v. LaBree*, 2012 ME 61, ¶ 2, 52 A.3d 923 (regarding a gestational surrogate who carried a child to whom she was not biologically related after *in vitro* fertilization and zygote implantation).   In Delaware, for example, changes in family structure have been identified and attributed to "at least three areas in our society which have undergone significant change," namely, (1) "considerable scientific and technological advances," (2) "the

acknowledgement by many states of the rights of persons of the same sex to be considered parents of the same child," and (3) "the change from what we once knew as the traditional American family" consisting of two married parents and their children. *Bancroft v. Jameson*, 19 A.3d 730, 738-39 (Del. Fam. Ct. 2010). As the United States Supreme Court recognized more than a dozen years ago,

> [t]he demographic changes of the past century make it difficult to speak of an average American family. The composition of families varies greatly from household to household. While many children may have two married parents and grandparents who visit regularly, many other children are raised in single-parent households . . . . Understandably, in these single-parent households, persons outside the nuclear family are called upon with increasing frequency to assist in the everyday tasks of child rearing.

*Troxel v. Granville*, 530 U.S. 57, 63-64 (2000) (plurality opinion); *see Rideout v. Riendeau*, 2000 ME 198, ¶ 37, 761 A.2d 291 (Wathen, C.J., concurring).

[¶11] Despite these shifts in family and social structure, it remains "firmly established" that parents have "a fundamental liberty interest to direct the care, custody, and control of their children." *Davis v. Anderson*, 2008 ME 125, ¶ 18, 953 A.2d 1166 (citing *Troxel*, 530 U.S. at 65); *Rideout,* 2000 ME 198, ¶ 12, 761 A.2d 291 (plurality opinion). To preserve that right, and in recognition of the presumption that parents act in their children's best interests, unless a person is determined to be an unfit parent, there is "normally . . . no reason for the State to inject itself into the private realm of the family to further question the ability of

that parent to make the best decisions concerning the rearing of that parent's children." *Rideout*, 2000 ME 198, ¶¶ 12, 18, 761 A.2d 291 (alteration omitted) (quotation marks omitted). Among the many aspects of a parent's fundamental right is the right to decide who may associate with the child. *See id*. ¶ 12; *Guardianship of Jewel M.*, 2010 ME 80, ¶¶ 4-5, 2 A.3d 301 (recognizing "a presumption that fit parents act in the best interests of their children," including with respect to requests for third-party visitation or parental rights (quotation marks omitted)).

[¶12] Nevertheless, a parent's "constitutional liberty interest in family integrity is not . . . absolute, nor forever free from state interference." *Rideout*, 2000 ME 198, ¶ 19, 761 A.2d 291. This is true in great part because the rights of another person—the child—must also be protected by the State. Thus, the focus of any standards by which the State is allowed to interfere must, by necessity, include the child. When the State does interfere with the fundamental right to parent, we must evaluate that interference with strict scrutiny—the highest level of scrutiny—which "requires that the State's action be narrowly tailored to serve a compelling state interest." *Id.* Pursuant to the strict scrutiny standard, we have limited the State's intrusions into the parent-child relationship to those instances in which

8

there is some urgent reason[3] or there are exceptional circumstances affecting the child that justify the intrusion.[4] *See Robichaud v. Pariseau*, 2003 ME 54, ¶ 7, 820 A.2d 1212; *Merchant v. Bussell*, 139 Me. 118, 121-22, 27 A.2d 816 (1942).

[¶13]   There are currently four statutory means by which the Legislature allows the State, through the courts, to order parental rights or visitation to a non-parent.[5]  We have addressed three of the four statutory means[6] and, in each

---

[3]  In 1942, we stated, "The natural right of a parent to the care and control of a child should be limited only for the most urgent reasons." *Merchant v. Bussell*, 139 Me. 118, 122, 27 A.2d 816 (1942). "Urgent reasons" constitute the compelling State interest necessary for the State's intrusion into the parent's decision making.  Since then, we have regularly used the phrase "urgent reasons" when discussing State intrusion into parental rights.  *See, e.g., Robichaud v. Pariseau*, 2003 ME 54, ¶ 10, 820 A.2d 1212; *Croxford v. Roberts*, 509 A.2d 662, 663 (Me. 1986); *Stanley v. Penley*, 46 A.2d 710, 711 (Me. 1946).  We note here that "compelling," "urgent," and "exceptional" are all adjectives intended to address the heightened interest the State must present before it may interfere in a parent's right to raise a child.  We use "exceptional circumstances" here as the most precise indicator of that heightened interest.

[4]  We also employ additional procedural protections in such matters in an effort to balance the fundamental right at stake with the necessity for State intervention.  *See Rideout v. Riendeau*, 2000 ME 198, ¶ 19, 761 A.2d 291 (plurality opinion); *Conlogue v. Conlogue*, 2006 ME 12, ¶ 13, 890 A.2d 691.  For example, pursuant to the Child and Family Services and Child Protection Act, 22 M.R.S. §§ 4001 to 4099-H (2013), the State may temporarily interfere in an individual's right to parent a child only when a court determines, by a preponderance of evidence, that the individual has subjected the child to "jeopardy" in the form of "serious abuse or neglect."  22 M.R.S. §§ 4002(6), 4035(2); *see In re Christmas C.*, 1998 ME 258, ¶ 13, 721 A.2d 629.  Additionally, an individual's right to parent his or her child may be terminated only pursuant to a higher burden of clear and convincing evidence.  *In re Christmas C.*, 1998 ME 258, ¶ 13, 721 A.2d 629; *see In re C.P.*, 2013 ME 57, ¶ 9, 67 A.3d 558.

[5]  These four statutory methods are: (1) pursuant to the Child and Family Services and Child Protection Act, which allows the State to place a child with a non-parent to protect the child from abuse or neglect, *see* 22 M.R.S. § 4036(1)(F); (2) pursuant to the Grandparents Visitation Act, 19-A M.R.S. §§ 1801-1805 (2013), which allows a grandparent to seek "reasonable rights of visitation or access" in certain limited circumstances, 19-A M.R.S. § 1803(1); (3) pursuant to 19-A M.R.S. § 1653(2)(B) (2013), which provides that "[t]he court may award reasonable rights of contact with a minor child to a 3rd person" within the context of a parental rights and responsibilities order, *see Davis v. Anderson*, 2008 ME 125, ¶ 19, 953 A.2d 1166; and (4) pursuant to the guardianship provisions of the Probate Code, *see* 18-A M.R.S. § 5-204 (2013).

[6]  We have not yet evaluated the nature or extent of the remedy provided by 19-A M.R.S. § 1653(2)(B).

case, we have considered whether, in light of the government interference contemplated, the required compelling State interest exists.

[¶14] Using the lens of strict scrutiny, we have, to date, recognized only two types of exceptional circumstances that are legally sufficient to justify the State's interference with the fundamental right to parent.[7] First, we have recognized that the State has a compelling interest in limiting, restricting, or even terminating a parent's rights when harm to the child will result from the absence of such governmental interference. *See In re Jazmine L.*, 2004 ME 125, ¶¶ 12, 14-15, 861 A.2d 1277. Thus, pursuant to the Child and Family Services and Child Protection Act, 22 M.R.S. §§ 4001 to 4099-H (2013), the State may place a child with a non-parent to protect the child from abuse or neglect. 22 M.R.S. § 4003. Similarly, a court may appoint a guardian for a child when, inter alia, the child is subjected to certain harmful circumstances, such as a "temporarily intolerable . . . living situation." 18-A M.R.S. § 5-204 (2013); *see Guardianship of Jewel M.*, 2010 ME 17, ¶ 12, 989 A.2d 726 (discussing that the guardianship statute's requirement of proof that the parent is unable to meet the child's needs constitutes an "urgent reason" satisfying strict scrutiny).

---

[7] The Legislature, when it acts in this area, may determine that, as a matter of policy, the State should interfere in other circumstances.

[¶15]   Second, we have held that there are exceptional circumstances to allow the State to interfere in the right to parent when necessary to preserve a child's "sufficient existing relationship" to a grandparent.[8]   *Passalaqua v. Passalaqua*, 2006 ME 123, ¶ 12, 908 A.2d 1214.   Such exceptional circumstances have only been recognized within the confines of the Grandparents Visitation Act, 19-A M.R.S. §§ 1801-1805 (2013), however, by which the Legislature codified a method of allowing a grandparent's continuing contact with a child over a fit parent's objection in certain limited circumstances, and in the absence of proof of harm to the child.

[¶16]   The distinction between the exceptional circumstances required for intervention in a child protection or guardianship matter—i.e., harm—as opposed to those adequate to support an award of grandparent visitation—i.e., a sufficient existing relationship—reflects the difference in the extent of the intrusion into the parent's rights.   In both child protection actions pursuant to title 22 and in guardianship matters pursuant to title 18-A, the interference with a parent's fundamental rights may be extensive, including the actual removal of a child from a parent's care.   Pursuant to the Grandparents Visitation Act, in contrast, the court

---

[8]   Even in considering what relationships are "sufficient existing" ones to meet the exceptional circumstances requirement of strict scrutiny, however, we have so far set the bar quite high by requiring proof of "extraordinary contact," i.e., proof that the non-parent seeking rights to the child has "functioned as [a] parent[] to the child[] for a significant period of time."   *Conlogue*, 2006 ME 12, ¶¶ 9-10, 17, 890 A.2d 691 (quotation marks omitted); *see Robichaud*, 2003 ME 54, ¶ 10, 820 A.2d 1212; *Rideout*, 2000 ME 198, ¶ 27, 761 A.2d 291; *see also Davis*, 2008 ME 125, ¶ 15, 953 A.2d 1166.

may award only "reasonable rights of visitation or access" to the child, and even then only to the extent that the award does not "significantly interfere with any parent-child relationship or with the parent's rightful authority over the child." 19-A M.R.S. § 1803(3). In short, in those matters currently recognized in Maine that could involve an award of the full panoply of parental rights and responsibilities to a non-parent, we have required a showing of harm to the child in the absence of such government interference.

[¶17] In the matter before us, we are called upon to consider how a person who is not a biological or adoptive parent may, over the objection of the child's fit biological or adoptive parent, obtain not just contact with or access to the child, but that full panoply of parental rights and responsibilities as a de facto parent. Because the extent of such an intrusion into a parent's fundamental rights is substantial, and for the reasons explained below, a court may determine that an individual is a child's de facto parent only when the failure or refusal to so determine will result in harm to the child.

A.    Establishing De Facto Parenthood

[¶18] Parenthood is meant to be defined by the Legislature, steeped as it is in matters of policy requiring the weighing of multiple viewpoints. *See Miller v. Youakim*, 440 U.S. 125, 142 n.21 (1979) (stating that the foster care system involves "issues of legislative policy [that] are better addressed to the wisdom of

12

[the legislature] than to the judgment of this Court" (alterations omitted) (quotation marks omitted)); *Brann v. State*, 424 A.2d 699, 704 (Me. 1981) ("It is appropriate for the legislature rather than the court to make the policy decision regarding what is practicable in a given situation.") Although we have been discussing de facto parenthood for almost thirteen years,[9] there is currently no Maine statutory reference to de facto parenthood. We take this opportunity to again emphasize that, given the evolving compositions of families and the need for a careful approach, this issue would be best addressed by the Legislature.

[¶19] In the absence of Legislative action in such an important and unsettled area, however, we must provide some guidance to trial courts faced with de facto parenthood petitions. *See Cheshire Med. Ctr. v. W.R. Grace & Co.*, 49 F.3d 26, 33 (1st Cir. 1995) ("Ordinarily issues of public policy are in the first instance appropriate for a legislature's determination by statute and, if not determined by statute, may be determined by a state court of last resort in its decisions setting precedents."). Although in *Rideout* we discussed the constitutionality of the Grandparents Visitation Act, the grandparents had acted as "parents" for the children involved, and in our discussion of their circumstances we noted that other jurisdictions, "without statutory authority, have modified the common law

---

[9] Our first mention of the phrase "de facto parents" appears in *Rideout*, 2000 ME 198, ¶ 39, 761 A.2d 291 (Wathen, C.J., concurring). Earlier decisions set the stage for de facto parenthood, however, by discussing the award of child custody to a non-biological parent over the objection of the biological parent. *See, e.g., Merchant*, 139 Me. at 120-24, 27 A.2d 816 .

presumption and opened the door to visitation by adults who have become the de facto parent[s] of a child." 2000 ME 198, ¶ 40, 761 A.2d 291 (Wathen, C.J., concurring). Five months later, we concluded that a person might obtain de facto parenthood status in Maine "through the development of the parental relationship over time." *Stitham v. Henderson*, 2001 ME 52, ¶ 24, 768 A.2d 598 (Saufley, J., concurring). In that case, a man and woman were married for seven years before the woman gave birth to a child. *Id*. ¶ 2. The parties divorced when the child was three years old, but the man did not learn until after the divorce that he was not the child's biological father. *Id*. ¶¶ 2-3. The man had been declared as the child's father on a variety of legal documents, including the child's birth certificate and the parties' divorce judgment, and had acted as her father since her birth. *Id*. ¶ 2. In response to his attempt to maintain parental rights, we held that the court may award contact to a "person with significant bonds to the child" who has had more than a "limited relationship to the child." *Id*. ¶ 17 n.6.

[¶20] Since our announcement in 2001 that in some circumstances we would recognize de facto parents, we have had occasion to discuss the concept in only four cases—*C.E.W. v. D.E.W.*, 2004 ME 43, 845 A.2d 1146; *Young v. Young*, 2004 ME 44, 845 A.2d 1144; *Leonard v. Boardman*, 2004 ME 108, 854 A.2d 869; and *Philbrook*, 2008 ME 152, 957 A.2d 74. In *C.E.W.*, two women agreed that one

of them would conceive a child through artificial insemination, and both signed a parenting agreement detailing their equal rights to the child. 2004 ME 43, ¶ 2, 845 A.2d 1146. Five years after the child's birth, the couple separated and the non-biological mother instituted parental rights proceedings. *Id*. ¶¶ 1, 3, 5. We discussed de facto parenthood in terms of "third persons who have played an unusual and significant parent-like role in a child's life," and characterized the role as "permanent, unequivocal, committed, and responsible," but we did not precisely determine its parameters given the parties' agreement that the non-biological parent was a de facto parent. *Id*. ¶¶ 9, 13-14. Rather, in *C.E.W.*, we were concerned only with the remedy of an award of parental rights and responsibilities when the parties stipulate that a de facto parenthood relationship exists. *Id*. ¶¶ 14-15.

[¶21] In *Young*, a man married a woman who already had a child, and the couple then had a child together. 2004 ME 44, ¶ 2, 845 A.2d 1144. When the parties began divorce proceedings after five years, the District Court, on the grounds that it lacked jurisdiction, refused to consider the man's role in his stepchild's life in awarding parental rights and responsibilities between the parties. *Id*. ¶¶ 2-3. We vacated the judgment after concluding that the District Court "possesses broad powers to ensure that a child does not, without cause, lose the relationship with the person who has previously been acknowledged to be the

father through the development of the parental relationship over time." *Id*. ¶ 5 (alteration omitted) (quotation marks omitted).

[¶22] Similarly, in *Leonard*, a man began a relationship with a pregnant woman, and the couple eventually began living together and had two more children over the course of seven years. 2004 ME 108, ¶¶ 3-5, 854 A.2d 869. Later, in a habeas corpus action, the court found that the man was the de facto parent of the eldest child. *Id*. ¶ 11. We remanded the matter for a determination of parental rights and responsibilities based on that finding. *Id*. ¶¶ 17-18.

[¶23] Finally, in *Philbrook*, a woman and her children lived with the woman's parents for periods of time over a span of ten years. 2008 ME 152, ¶¶ 2-6, 957 A.2d 74. When the trial court determined that the grandparents did not have standing to pursue a parental rights action, the grandparents appealed. *Id*. ¶ 14. In affirming the judgment, we held that de facto parenthood is a doctrine of limited application, to be employed "when the putative de facto parent has 'undertaken a permanent, unequivocal, committed, and responsible parental role in the child's life.'" *Id*. ¶ 22 (quoting *C.E.W.*, 2004 ME 43, ¶ 14, 845 A.2d 1146). We also noted that in each case where we recognized a person as a de facto parent, that person had been understood and acknowledged as a parental figure by both the child and the child's biological or adoptive parent. *Id*. ¶ 23.

[¶24]  In our discussions of de facto parenthood in Maine through these five decisions, we have not yet determined what precise test of de facto parenthood will satisfy the exceptional circumstances requirement of strict scrutiny.  *See id.* ¶ 22 ("[W]e have not precisely defined the parameters of the de facto parent concept . . . ."); *C.E.W.*, 2004 ME 43, ¶ 13, 845 A.2d 1146 ("We do not address the separate and more fundamental question of by what standard the determination of de facto parenthood should be made.").  We also have not announced the standard of proof to be applied in such a determination.

[¶25]  Moore encourages us to adopt the test of de facto parenthood set out in American Law Institute, *Principles of the Law of Family Dissolution* § 2.03(1)(c) (2002), which defines a de facto parent as a person who, for two years or more, has lived with the child and performed at least as much of the caretaking for the child as the legal parent.[10]  *See Stitham*, 2001 ME 52, ¶ 25, 768 A.2d 598

---

[10]   American Law Institute, *Principles of the Law of Family Dissolution* § 2.03(1)(c) (2002) defines a de facto parent as follows:

(c) A *de facto parent* is an individual other than a legal parent or a parent by estoppel who, for a significant period of time not less than two years,

(i) lived with the child and,

(ii) for reasons primarily other than financial compensation, and with the agreement of a legal parent to form a parent-child relationship, or as a result of a complete failure or inability of any legal parent to perform caretaking functions,

(A) regularly performed a majority of the caretaking functions for the child, or

(Saufley, J., concurring). The American Law Institute also has set forth the definition of a parent by estoppel, but Moore does not make any claim pursuant to that principle.[11] American Law Institute, *Principles of the Law of Family Dissolution* § 2.03(1)(b) (2002).

[¶26] After considering our precedent, the ALI standards, and the decisions of other jurisdictions, we continue to decline to adopt the ALI standards as the test of de facto parenthood in Maine. *See, e.g., C.E.W.*, 2004 ME 43, ¶ 14 n.13,

---

> (B) regularly performed a share of caretaking functions at least as great as that of the parent with whom the child primarily lived.

[11] American Law Institute, *Principles of the Law of Family Dissolution* § 2.03(1)(b) (2002) defines a parent by estoppel as follows:

> (b) A *parent by estoppel* is an individual who, though not a legal parent,
>
> (i) is obligated to pay child support under Chapter 3; or
>
> (ii) lived with the child for at least two years and
>
> (A) over that period had a reasonable, good-faith belief that he was the child's biological father, based on marriage to the mother or on the actions or representations of the mother, and fully accepted parental responsibilities consistent with that belief, and
>
> (B) if some time thereafter that belief no longer existed, continued to make reasonable, good-faith efforts to accept responsibilities as the child's father; or
>
> (iii) lived with the child since the child's birth, holding out and accepting full and permanent responsibilities as parent, as part of a prior co-parenting agreement with the child's legal parent (or, if there are two legal parents, both parents) to raise a child together each with full parental rights and responsibilities, when the court finds that recognition of the individual as a parent is in the child's best interests; or
>
> (iv) lived with the child for at least two years, holding out and accepting full and permanent responsibilities as a parent, pursuant to an agreement with the child's parent (or, if there are two legal parents, both parents), when the court finds that recognition of the individual as a parent is in the child's best interests.

845 A.2d 1146 ("Although [*Rideout* and *Stitham*] cite to the A.L.I.'s PRINCIPLES, neither adopts its standard, nor do we do so today."); *Rideout*, 2000 ME 198, ¶ 27, 761 A.2d 291. If and when the Legislature ventures into this area, it may choose to adopt some or all of the ALI standards.

[¶27] Instead, in the absence of legislation in this area, we cleave to the standard we have already announced. An individual seeking parental rights as a de facto parent must therefore show that (1) he or she has undertaken a "permanent, unequivocal, committed, and responsible parental role in the child's life," *Philbrook*, 2008 ME 152, ¶ 22, 957 A.2d 74 (quoting *C.E.W.*, 2004 ME 43, ¶ 14, 845 A.2d 1146), and (2) that there are exceptional circumstances sufficient to allow the court to interfere with the legal or adoptive parent's rights. Because the fundamental rights of a biological or adoptive parent are at issue and strict scrutiny must be applied to any interference with that right, *see Rideout*, 2000 ME 198, ¶¶ 18-19, 761 A.2d 291, and because the establishment of parental rights is no less permanent than the termination of parental rights, *see* 22 M.R.S. § 4055(1)(B)(2), the petitioner must make those showings by clear and convincing evidence.

   1.   Permanent, Unequivocal, Committed, and Responsible Parental Role

[¶28] We define a "permanent, unequivocal, committed, and responsible parental role" by looking to the elements of de facto parenthood employed in Massachusetts:

> A de facto parent is one who has no biological relation to the child [as
> a parent], but has participated in the child's life as a member of the
> child's family. The de facto parent resides with the child and, with
> the consent and encouragement of the legal parent, performs a share
> of caretaking functions . . . .

*E.N.O. v. L.M.M.*, 711 N.E.2d 886, 891 (Mass. 1999)). This language, which we have already cited with approval, *see Stitham*, 2001 ME 52, ¶ 25 n.15, 768 A.2d 598 (Saufley, J., concurring); *see also Rideout*, 2000 ME 198, ¶ 40, 761 A.2d 291 (Wathen, C.J., concurring) (citing *E.N.O.* generally), gives litigants and courts a list of the necessary elements for determining whether an individual's relationship with a child is permanent, unequivocal, committed, and responsible.[12] It is a test that not only requires the petitioner to establish that he or she has resided with the child "as a member of the child's family," *E.N.O.*, 711 N.E.2d at 891, but also distinguishes between "parenting functions"—an umbrella term that encompasses activities that benefit the child but do not necessarily involve direct involvement with the child, such as providing financial support for the family or maintaining the

---

[12] Unlike the ALI or the Dissenting Opinion, we do not impose a minimum duration for the relationship that categorically eliminates the possibility of a de facto parent for a child younger than two or five years old, respectively. *See* Dissenting Opinion ¶ 68; *Smith v. Jones*, 868 N.E.2d 629, 635 n.10 (Mass. App. Ct. 2007) (discussing the Massachusetts courts' similar "reluctance to adopt a bright-line time requirement" and noting that a failure to satisfy any particular duration element "would not likely be sufficient for a conclusion that no de facto parenthood status existed"). Nevertheless, we note that in the de facto parenthood cases presented to us, none involved a relationship between the de facto parent and child that was shorter than five years. *See Philbrook v. Theriault*, 2008 ME 152, ¶¶ 2-6, 957 A.2d 74; *Leonard v. Boardman*, 2004 ME 108, ¶¶ 3-5, 854 A.2d 869; *Young v. Young*, 2004 ME 44, ¶ 2, 845 A.2d 1144; *C.E.W. v. D.E.W.*, 2004 ME 43, ¶¶ 1-3, 845 A.2d 1146; *Stitham v. Henderson*, 2001 ME 52, ¶ 2, 768 A.2d 598.

20

home—with the more relevant subset of "caretaking functions"—which involve "the direct delivery of day-to-day care and supervision of the child, including grooming, feeding, medical care, and physical supervision."[13] *A.H. v. M.P.*, 857 N.E.2d 1061, 1071-72 (Mass. 2006) (alterations omitted) (quotation marks omitted) (noting that "the parent-child bond grows from the myriad hands-on activities of an adult in tending to a child's needs").  Only by establishing that he or she provided some actual caretaking functions can a petitioner be successful.[14] In addition, the test accounts for the intent of the legal parent and the putative de facto parent to co-parent, as measured before the dissolution of their relationship, or the intent of the legal parent that the non-parent act as parent in place of the legal parent.[15] *See Smith v. Jones*, 868 N.E.2d 629, 634 (Mass. App. Ct. 2007).  It also ensures that the relationship was not undertaken for the purposes of financial

---

[13] This distinction has been held to be "not appropriate" as between two legal parents.  *A.H. v. M.P.*, 857 N.E.2d 1061, 1072 n.15 (Mass. 2006).

[14] The *E.N.O.* court required a petitioner to demonstrate that he had performed a share of caretaking functions "at least as great as the legal parent."  *E.N.O. v. L.M.M.*, 711 N.E.2d 886, 891 (Mass. 1999).  At this juncture, we do not set the bar so high for this portion of the de facto parenthood standard.

Moreover, we disagree with the statements in the Dissenting Opinion that our decision not to require an equal amount of caretaking "effectively relaxes the Massachusetts standard" or creates a "less demanding approach" to establishing de facto parenthood.  Dissenting Opinion ¶ 70.  To the contrary, we, unlike the Massachusetts court in *E.N.O.*, require proof of harm to the child in the absence of a declaration of de facto parenthood in order to more robustly satisfy the strict scrutiny requirement. *Infra* ¶ 29.  Thus, the de facto parenthood standards we announce today are, overall, significantly more burdensome than those discussed in the *E.N.O.* decision.

[15] A court-ordered substitution of a non-parent for a legal parent, e.g., the creation of a guardianship, may also be considered.  *See* 18-A M.R.S. § 5-204.

compensation or with other institutional approval, as with a nanny, foster parent, or daycare provider. *See In re Parentage of L.B.*, 122 P.3d 161, 176 (Wash. 2005).

2.      Exceptional Circumstances

[¶29]  As discussed below, a de facto parent potentially may be awarded all of the parental rights and responsibilities enjoyed by a biological or adoptive parent.  A non-parent should have the opportunity to obtain the full panoply of rights and responsibilities only under the most exceptional circumstances, i.e., only when the non-parent can establish, by clear and convincing evidence, that harm to the child will occur if he or she is not acknowledged to be the child's de facto parent.  We are not here announcing that "harm" in these cases must be the equivalent of "jeopardy" in title 22 cases.  Nonetheless, a court contemplating an order that creates a parent out of a non-parent must first determine that the child's life would be substantially and negatively affected if the person who has undertaken a permanent, unequivocal, committed, and responsible parental role in that child's life is removed from that role.

B.      Effect of a Determination of De Facto Parenthood

[¶30]  A determination that a person is a de facto parent means that he or she is a parent on equal footing with a biological or adoptive parent, that is to say, with the same opportunity for parental rights and responsibilities.  *See C.E.W.*, 2004 ME 43, ¶ 11, 845 A.2d 1146 (holding that once a person is determined to be a de facto

parent, "the court may consider an award of parental rights and responsibilities to that individual as a parent"); *see also In re Parentage of L.B.*, 122 P.3d at 177 (concluding that a de facto parent "stands in legal parity with an otherwise legal parent"). Although the Legislature has yet to speak about de facto parenthood, it has provided the framework in which parental rights and responsibilities are awarded as between parents, that is, through 19-A M.R.S. § 1653. In particular, section 1653 enumerates the provisions that a court "must include" in a parental rights order:

> **(1)** Allocated parental rights and responsibilities, shared parental rights and responsibilities or sole parental rights and responsibilities, according to the best interest of the child as provided in subsection 3. An award of shared parental rights and responsibilities may include either an allocation of the child's primary residential care to one parent and rights of parent-child contact to the other parent, or a sharing of the child's primary residential care by both parents. If either or both parents request an award of shared primary residential care and the court does not award shared primary residential care of the child, the court shall state in its decision the reasons why shared primary residential care is not in the best interest of the child;
>
> **(2)** Conditions of parent-child contact in cases involving domestic abuse as provided in subsection 6;
>
> **(3)** A provision for child support as provided in subsection 8 or a statement of the reasons for not ordering child support;
>
> **(4)** A statement that each parent must have access to records and information pertaining to a minor child, including, but not limited to, medical, dental and school records and other information on school activities, whether or not the child resides with the parent, unless that access is found not to be in the best interest of the child or that access

is found to be sought for the purpose of causing detriment to the other parent. If that access is not ordered, the court shall state in the order its reasons for denying that access;

**(5)** A statement that violation of the order may result in a finding of contempt and imposition of sanctions as provided in subsection 7;

**(6)** A statement of the definition of shared parental rights and responsibilities contained in section 1501, subsection 5, if the order of the court awards shared parental rights and responsibilities;

. . . .

19-A M.R.S. § 1653(2)(D).

[¶31] Section 1653(2)(D)(3) requires that "[e]ither parent of a minor child shall contribute reasonable and just sums as child support payable weekly, biweekly, monthly or quarterly." 19-A M.R.S. § 1653(8). Child support is calculated pursuant to 19-A M.R.S. §§ 2001-2012 (2013). In particular, section 2005 imposes a rebuttable presumption "that the parental support obligation derived from the support guidelines is the amount ordered to be paid, unless support is established under section 2006, subsection 5 or section 2007." 19-A M.R.S. § 2005.

[¶32] In short, once the court finds that a party is a de facto parent, that party is a parent for all purposes, and the court must then go on to consider the appropriate award of parental rights and responsibilities—including child

24

support—pursuant to title 19-A.[16] *See Leonard,* 2004 ME 108, ¶¶ 17-18, 854 A.2d 869 (holding that when a party is found to be a de facto parent, the court must "give complete relief to the parties [by] establish[ing] parental rights and responsibilities" pursuant to section 1653 in proceedings involving the biological father).

[¶33]  We recognize that many aspects of the parental rights order may be cumbersome in matters in which there are more than two legal parents. Nevertheless, the parental rights statutes already contain language pursuant to which such a judgment may be fashioned to reflect the reality of a family. *See, e.g.,* 19-A M.R.S. § 2007(3)(A) (setting out when the court may deviate from the child support guidelines, such as when the result would be "unjust, inequitable or not in the child's best interest").

---

[16]  Other jurisdictions have begun to determine child support as applied to de facto parents. *See, e.g., Jones v. Barlow*, 154 P.3d 808, 823 n.3 (Utah 2007) (Durham, C.J., dissenting) ("De facto parenthood is a two-way street.  While de facto parent status entitles a third party to standing for visitation, it also requires a de facto parent to provide financial support for the child."); *see also Karin T. v. Michael T.*, 484 N.Y.S.2d 780, 784 (N.Y. Fam. Ct. 1985) (holding that a person who agreed to co-parent a child conceived by means of artificial insemination could not assert that she was not responsible for child support for lack of parenthood); *In re Streibeck*, No. 26553-6-III, 2008 WL 4599683, at *3 (Wash. Ct. App. Oct. 16, 2008) (involving a biological father of a child who attempted to challenge a child support order requiring him to pay the biological mother on the ground that it failed to include a reduction to account for another man's child support obligation as a de facto parent); *In re Custody of H.S.H.-K.*, 533 N.W.2d 419, 435-36 (Wis. 1995) (adopting a four-part test of parenthood that includes whether the petitioner has assumed the financial obligations of parenthood, including "contributing towards the child's support"); *cf. T.F. v. B.L.*, 813 N.E.2d 1244, 1253 (Mass. 2004) (refusing to force a domestic partner to pay child support for a child for whom she was not a de facto parent).

C.    Procedure

[¶34] We cannot emphasize enough that parenthood is forever, whether the relationship is biological, adoptive, or de facto. The role of a de facto parent is no less permanent than that of any other parent; it is a role that may be surrendered, released, or terminated only in limited circumstances as approved by a court. *See* 18-A M.R.S. §§ 9-202, 9-204, 9-302 (2013); 22 M.R.S. § 4055(1)(B)(1). The obligation of a de facto parent to pay child support, too, remains in force until modified by the court, or until the child turns eighteen or graduates from secondary school, or marries, or joins the armed services. 19-A M.R.S. § 1653(12).

[¶35] The determination of the rights and responsibilities of a person petitioning for status as a de facto parent must occur in three stages. First, because forcing a parent to expend time and resources defending against a third-party claim to a child is itself an infringement on the fundamental right to parent,[17] *Conlogue*, 2006 ME 12, ¶ 13, 890 A.2d 691; *Rideout*, 2000 ME 198, ¶ 30, 761 A.2d 291, a party seeking de facto parenthood status must, at the outset, establish his or her standing to initiate the litigation by making a prima facie showing of de facto parenthood according to the two-part test we have announced today, i.e., that the petitioner had a permanent, unequivocal, committed, and responsible role

---

[17] This preliminary determination regarding a person's standing to assert de facto parenthood is but one means of satisfying the strict scrutiny test. *See Rideout*, 2000 ME 198, ¶ 19, 761 A.2d 291; *Conlogue*, 2006 ME 12, ¶ 13, 890 A.2d 691.

according to the *E.N.O.* elements, and that, if that relationship is terminated, the child will suffer harm. At this first stage, "the court must make a preliminary determination that such a relationship does in fact exist before a parent can be required to fully litigate the issue." *Philbrook*, 2008 ME 152, ¶ 19, 957 A.2d 74. If the biological or adoptive parent opposes the petition, this initial determination may be decided on affidavits through a motion to dismiss. *Id.* ¶¶ 15, 17.

[¶36] Second, if the petitioner satisfies the prima facie burden, the petitioner must then prove, by clear and convincing evidence, that he or she satisfies both elements of the two-part test we announce here and *is*, therefore, the child's de facto parent. Whether the petitioner has established these elements is a highly fact-intensive inquiry that requires a consideration of the totality of the circumstances.

[¶37] Finally, if, and only if, the individual is a de facto parent, the court must establish the extent of the de facto parent's rights and responsibilities pursuant to 19-A M.R.S. § 1653. *See C.E.W*, 2004 ME 43, ¶ 11, 845 A.2d 1146. This task is accomplished according to the preponderance of the evidence standard applicable to parental rights actions generally because the court will reach this question only if the petitioner has established, by clear and convincing evidence, that he or she *is* the child's de facto parent. *See Hatch v. Anderson*, 2010 ME 94, ¶ 12, 4 A.3d 904.

[¶38] At the heart of the determination of a de facto parent's rights and responsibilities, as with any other award of parental rights and responsibilities, is the best interest of the child, which is defined with reference to nineteen factors in 19-A M.R.S. § 1653(3). *See C.E.W.*, 2004 ME 43, ¶ 11, 845 A.2d 1146; *see also Kelley v. Snow*, 2009 ME 128, ¶ 15, 984 A.2d 1281.

D.    Conclusion

[¶39] Amidst the sequence of events and consolidation of actions that constituted the case presented to it,[18] the trial court handled this case with care and skill. It followed the procedure for de facto parenthood that has already been established by making a prima facie determination of standing, and by imposing the burden of proof on Pitts. It also applied the clear and convincing standard of proof to protect the fundamental right at issue, and expressly considered Pitts's de facto parenthood status before, and independently from, its best interest determination in fashioning the remedy of an award of contact with the child. *See In re Scott S.*, 2001 ME 114, ¶ 19, 775 A.2d 1144.

[¶40] Nevertheless, because this is our first articulation of the force and duration of the consequences of de facto parenthood, and our first announcement

---

[18] As noted earlier, the parental rights and responsibilities action involving the child's biological parents, Moore and Hague, was consolidated with Pitts's de facto parenthood action, and Hague actually participated in and testified during the consolidated hearing. Given these facts, we need not address how the absence of a biological or adoptive parent might affect a petitioner's attempt to establish de facto parenthood.

of the two-part standard pursuant to which de facto parenthood petitions must be evaluated, we vacate the court's judgment and remand the matter for the court—and the parties—to consider anew their positions on this lifelong remedy affecting the life of a child.

[¶41]  On remand, the court must reconsider the record and allow the parties to submit additional evidence to determine whether Pitts can meet his burden of establishing de facto parenthood.  If Pitts is determined to be the child's de facto parent, the court must fashion a remedy by delineating his parental rights and responsibilities, including child support, and will have to do so in conjunction with re-determining the parental rights and responsibilities of Moore and Hague.

The entry is:

> Judgment vacated.  Remanded for further proceedings consistent with this opinion.

---

JABAR, J., with whom SILVER, J., joins, concurring.

[¶42]   I join with the Plurality Opinion, which takes substantial steps to clarify this unsettled area of law, and with its result.  However, on one aspect of the Plurality's analysis, I disagree with it, and, necessarily, with the Dissent.[19]  I do not

---

[19]   The Dissent agrees with the Plurality that a measurable degree of harm is required before interfering with a parent's constitutional liberty interests, Plurality Opinion ¶ 16, Dissenting Opinion ¶ 62, but would require a much greater showing of serious harm to a child's "long-term physical, emotional, or developmental well-being."  Dissenting Opinion ¶ 63.

join section II(A)(2) of the Plurality Opinion, and I write separately because I do not believe that harm to the child is constitutionally required in order to obtain de-facto-parenthood status over a fit parent's objection. *See Troxel v. Granville,* 530 U.S. 57, 73 (2000) (plurality opinion); *Rideout v. Riendeau,* 2000 ME 198, ¶ 23, 761 A.2d 291 (plurality opinion). *But see* Plurality Opinion ¶¶ 16, 29; Dissenting Opinion ¶ 62.

[¶43]  The Plurality holds that, as a matter of constitutional law, persons seeking de facto parenthood status must demonstrate that "the child's life would be substantially and negatively affected" before a court can award that status over a biological or adoptive parent's objections. Plurality Opinion ¶ 29. I disagree. Parents' fundamental rights to the custody and control of their children do not require a threshold showing of harm to the child before a court can interfere with those rights. *See Troxel,* 530 U.S. at 73; *Rideout,* 2000 ME 198, ¶ 23, 761 A.2d 291. Rather, the appropriate constitutional inquiry should weigh both a parent's fundamental liberty interests and a child's interest in continuing contact with an adult "'who has acted as a parent to [the child].'" *Rideout,* 2000 ME 198, ¶ 27, 761 A.2d 291 (quoting *Youmans v. Ramos,* 711 N.E.2d 165, 172 (Mass. 1999)).

[¶44]  Although the Dissent notes that we have "recognized . . . [that] a compelling state interest requires a showing of some degree of harm or the threat

of harm to the child before a court may interfere with the parental rights of a fit parent," Dissenting Opinion ¶ 62, neither our precedent nor that of the U.S. Supreme Court has ever required harm to the child as the *only* compelling state interest to justify interfering with a parent's fundamental liberty interest. Rather, in *Troxel*, the Supreme Court explicitly declined to address "whether the Due Process Clause requires . . . a showing of harm or potential harm to the child as a condition precedent to granting visitation," 530 U.S. at 73, and it has not yet conclusively addressed the issue.[20]

[¶45] We have, however, addressed the question of whether some degree of harm or potential harm is a necessary prerequisite before awarding a right of custody or visitation to third parties. *Rideout v. Riendeau*, 2000 ME 198, ¶¶ 23-25, 761 A.2d 291 (plurality opinion). Contrary to the Dissent's characterization of that case, a plurality of this Court concluded that a showing of harm is not constitutionally required. *See id.* *But see* Dissenting Opinion ¶ 62. In *Rideout*, the District Court had concluded that the Grandparents Visitation Act was unconstitutional because it did not require a finding of harm or a threat of harm as a precondition to interfering with the parents' fundamental liberty interests.

---

[20] The Dissent states that the U.S. Supreme Court "did not reach the question of to what *extent* harm must be shown for a court to override a parent's decision" regarding the custody and care of his or her children in *Troxel v. Granville*, 530 U.S. 57, 73 (2000) (plurality opinion). Dissenting Opinion ¶ 61 n.21 (emphasis added). However, the *Troxel* Court expressly declined to decide "whether the Due Process Clause requires . . . a showing of harm or potential harm to the child" at all. *Troxel*, 530 U.S. at 73 (plurality opinion); *see also id.* at 76-77 (Souter, J., concurring).

2000 ME 198, ¶ 22, 761 A.2d 291. We vacated that judgment, stating, "An element of 'harm' in the traditional sense is *not*, however, *the only compelling state interest* extant when *matters relating to the welfare of children are under scrutiny*." *Id.* ¶ 23 (emphasis added). We concluded that

> although the threat of harm to a child is certainly sufficient to provide the State with a compelling interest, harm consisting of a threat to physical safety or imminent danger is not a *sine qua non* for the existence of a compelling state interest. . . . [Rather,] "[t]he natural right of a parent to the care and control of a child should be limited only for the most *urgent reasons*." We conclude that "urgent reasons" exist, where, as here, a grandparent who has functioned as a parent to the child seeks continued contact with that child.

*Id.* ¶¶ 23-25 (footnote and citation omitted) (quoting *Merchant v. Bussell*, 139 Me. 118, 122, 27 A.2d 816 (1942)).

[¶46] Although I disagree with the Plurality's conclusion that interference with a parent's fundamental liberty interest requires a showing of harm to the child, we agree on several substantive points within the constitutional analysis. First, in both Maine and federal constitutional law, it is "firmly established" that a parent possesses a liberty interest, classified as a "fundamental right," in making decisions regarding the custody and control of his or her child. *Rideout*, 2000 ME 198, ¶¶ 18-19, 761 A.2d 291; *see also Troxel*, 530 U.S. at 65-66; *Merchant*, 139 Me. at 122, 27 A.2d 816; Plurality Opinion ¶ 11. Second, we agree that an award of parental rights and responsibilities to a de facto parent unquestionably

interferes with the parent's protected liberty interest. *See Sparks v. Sparks*, 2013 ME 41, ¶ 20, 65 A.3d 1223 ("A court order that assigns even temporary rights to a nonparent interferes with the parent's fundamental liberty interest."); Plurality Opinion ¶ 17. In protecting that liberty interest, our decisions afford parents great protection by adopting a presumption that fit parents act in the best interests of their children and by requiring any interference with that interest to pass the strict-scrutiny test, which provides "that the State's action [must] be narrowly tailored to serve a compelling state interest." *Rideout*, 2000 ME 198, ¶ 19, 761 A.2d 291; Plurality Opinion ¶ 12.

[¶47] Third, we agree that both harm and the threat of harm to the child constitute a compelling state interest sufficient to override a parent's fundamental liberty interest. *Rideout*, 2000 ME 198, ¶ 23, 761 A.2d 291 ("[T]he threat of harm to a child is certainly sufficient to provide the State with a compelling interest."); Plurality Opinion ¶ 14. Finally, we agree that any interference with a parent's fundamental liberty interest must be justified by something more than the best interest of the child. *See Troxel*, 530 U.S. at 72-73; *Rideout*, 2000 ME 198, ¶ 23, 761 A.2d 291; Plurality Opinion ¶¶ 11, 39.

[¶48] However, we disagree on the issue of whether harm to the child is the *only* compelling state interest that justifies a court's award of de facto parenthood status. *See* Plurality Opinion ¶¶ 16-17, 29; Dissenting Opinion ¶ 62. Because our

decisions require any interference with parents' due process rights to satisfy the strict scrutiny test, I set out the state's compelling interest and narrowly tailored means for safeguarding those rights in the de facto parenthood context. *See Rideout*, 2000 ME 198, ¶ 19, 761 A.2d 291.

A.    Compelling State Interest

[¶49]   The state has a compelling interest to justify interfering with the decision making authority of a fit parent "only for the most urgent reasons," *Merchant*, 139 Me. at 122, 27 A.2d 816, or in "exceptional circumstances," Plurality Opinion ¶ 12 & n.3; *see also Rideout*, 2000 ME 198, ¶ 23, 761 A.2d 291. There are certain vitally important relationships that a child shares with persons *other* than that child's biological parents that are worth preserving and urgent enough to warrant state intervention, even over the biological parent's objection. *Rideout*, 2000 ME 198, ¶ 27, 761 A.2d 291.  For example,

> [w]hen a grandparent has been the primary caregiver and custodian for a child over a significant period of time, the relationship between the child and the grandparent warrants application of the court's *parens patriae* authority on behalf of the child and provides a compelling basis for the State's intervention into an intact family with fit parents.

*Id.* (quotation marks omitted).

[¶50]   In order to safeguard the rights of the child, we have used our *parens patriae* authority to preserve close relationships between children and

grandparents, *id.*, and we should do the same to protect relationships between children and those persons who function as parents to the child. This approach recognizes that "[t]here is at a minimum a third individual, whose interests are implicated in every case to which [a de facto parenthood determination] applies—the child." *Troxel*, 530 U.S. at 86 (Stevens, J., dissenting); *see also* Plurality Opinion ¶ 12. "Consideration of rights *the child* holds is of paramount importance because, regardless of the family constellation from which the child comes, in any placement dispute it is *the child* who is the most vulnerable and the most voiceless." *In re Custody of Shields*, 136 P.3d 117, 130 (Wash. 2006) (Bridge, J., concurring). Recognizing the rights of de facto parents and children is part of a greater societal trend, as a plurality of the U.S. Supreme Court has observed:

> The nationwide enactment of nonparental visitation statutes is assuredly due, in some part, to the States' recognition of the[] changing realities of the American family. Because grandparents and other relatives undertake duties *of a parental nature* in many households, States have sought to ensure *the welfare of the children* therein by protecting the relationships those children form with such third parties.

*Troxel*, 530 U.S. at 64 (plurality opinion) (emphasis added).

[¶51] By reading the Due Process Clause to require the child to suffer harm or a threat of harm before awarding rights to a putative de facto parent, the Plurality and the Dissent focus solely on the rights of the parents to the exclusion of any competing interest of the child or third parties, who may have played a

much greater role in the child's life than the child's biological parent. "To focus with strict scrutiny . . . on the compelling interest of the state, vis-a-vis [only] the parents, is to ignore what may in a particular case be the equally compelling interests of the children, the family, and the [third parties seeking custody or visitation]." *Rideout*, 2000 ME 198, ¶ 39, 761 A.2d 291 (Wathen, C.J., concurring); *see also Merchant*, 139 Me. at 123-24, 27 A.2d 816.

[¶52] The expansive interpretation of parents' due process rights elevates the rights of the biological relative at a time when advances in reproductive technology, the legalization of same-sex marriage, and the complexities of the modern family render biological ties less relevant in identifying familial relationships. *See, e.g.*, *Nolan v. LaBree*, 2012 ME 61, ¶¶ 2-3, 5, 52 A.3d 923; *St. Mary v. Damon*, 309 P.3d 1027, 1029-31,1032-35 (Nev. 2013) (holding that both members of a same-sex couple could be considered "legal mothers" to a child born by implanting the fertilized egg of one partner into the other partner). Given the complexities of modern families, identifying the members of a child's family is not reducible to single-factor discrete rules. As Justice Stevens noted in *Troxel*,

> [a] plurality of [the U.S. Supreme] Court [has] recognized that the parental liberty interest was a function, not simply of "isolated factors" such as biology and intimate connection, but of the broader and apparently independent interest in family. A parent's rights with respect to her child have thus never been regarded as absolute, but rather are limited by the existence of an actual, developed relationship

with a child, and are tied to the presence or absence of some embodiment of family.

530 U.S. at 88 (Stevens, J., dissenting) (citations omitted).

[¶53] Thus, if a person seeking de facto parenthood status has demonstrated that he or she has "fully and completely undertaken a permanent, unequivocal, committed, and responsible *parental* role in the child's life," *C.E.W. v. D.E.W.*, 2004 ME 43, ¶ 14, 845 A.2d 1146 (emphasis added), the state has a compelling interest to intervene and apply its parens patriae authority to safeguard the relationships between children and their de facto parents.

B.    Narrowly Tailored Means

[¶54] Our decisions governing de facto parenthood also feature narrowly tailored means for safeguarding this compelling state interest. First, the threshold requirements necessary for standing to bring a de facto parenthood claim are very stringent, requiring a person to demonstrate that he or she has "undertaken a permanent, unequivocal, committed, and responsible parental role in the child's life." *See Philbrook v. Theriault*, 2008 ME 152, ¶ 22, 957 A.2d 74 (quotation marks omitted).

[¶55] Second, in practice, we have upheld the use of this equitable remedy in very limited circumstances, namely, "when the individual was understood and acknowledged to be the child's parent both by the child and by the child's other

parent." *Id.* ¶ 23; Plurality Opinion ¶ 28. Third, a person seeking de facto parenthood status must now demonstrate that he or she has fulfilled a parental role by clear and convincing evidence. Plurality Opinion ¶ 27. Finally, we also now require a putative de facto parent to demonstrate that he or she has had direct involvement with the child by performing "caretaking functions." Plurality Opinion ¶ 28 (quotation marks omitted). Because an award of de facto parenthood status is subject to these limitations, the state's intrusion on parents' rights is narrowly tailored to achieve its compelling interest in safeguarding the relationship between children and their de facto parents. *Cf. Rideout*, 2000 ME 198, ¶¶ 29-32, 761 A.2d 291.

C.    Conclusion

[¶56]    In evaluating de facto parenthood claims, the appropriate constitutional inquiry should weigh both the parents' fundamental liberty interests and the interests of their children in continuing contact with "adults who have fully and completely undertaken a permanent, unequivocal, committed, and responsible parental role in the child's life." *C.E.W.*, 2004 ME 43, ¶ 14, 845 A.2d 1146. The relationship between a child and an adult who has fulfilled this parental role is one of the most fundamentally important and formative relationships that child will have. Josh Gupta-Kagan, *Children, Kin, and Court: Designing Third Party Custody Policy To Protect Children, Third Parties, and Parents*, 12 N.Y.U. J.

Legis. & Pub. Pol'y 43, 99 (2008) ("In reality, parents are not the only adults to have significant or even primary relationships with children; millions of children have such relationships with third parties."); *see also Rideout*, 2000 ME 198, ¶ 40, 761 A.2d 291 (Wathen, C.J., concurring). Because the existing limitations that we have imposed on persons seeking de facto parenthood status are narrowly tailored to serve the state's compelling interest in maintaining these fundamental relationships, no further showing of harm to the child is constitutionally required. In other words, I read the Constitution to say that there are "urgent reasons," sufficient to constitute a compelling state interest, in maintaining relationships between de facto parents and children, without requiring a further showing of harm to the child. *See Rideout*, 2000 ME 198, ¶¶ 23-27, 761 A.2d 291.

[¶57] My concern is that if the Legislature takes up this issue and creates a statutory framework for establishing de facto parenthood status, it may view the necessity of showing "harm to the child" or the threat of harm to be a constitutional constraint on the factors that it deems relevant. The Dissent notes that "[n]umerous other jurisdictions also require a showing of harm or the threat of harm to the child before a court may award contact or parental rights over the objection of a fit parent." Dissenting Opinion ¶ 63 & n.22. Of the cases that the Dissent cites, in several of the jurisdictions, the state legislatures have imposed the requirement of harm to the child by statute. *See* Cal. Fam. Code § 3041(a)

(West 2007) (requiring the court, among other things, to "make a finding that granting custody to a parent would be detrimental to the child" before awarding custody to a nonparent); S.D. Codified Laws § 25-5-29(4) (2013) (requiring proof that "other extraordinary circumstances exist which, if custody is awarded to the parent, would result in serious detriment to the child" in order to rebut the presumption in favor of a fit parent's decision). However, other state legislatures have enacted de facto parenthood statutes without requiring an element of harm to the child. *See, e.g.*, Del. Code. Ann. tit. 13, § 8-201(c) (2013); D.C. Code §§ 16-831.01(1), 16-831.03 (2013). Whether, as a matter of public policy, de facto parenthood claims in Maine should include harm or the threat of harm to the child, is for the Legislature, not this Court, to decide.

[¶58] Until the U.S. Supreme Court determines that the Due Process Clause requires an element of harm to the child before interfering with a fit parent's rights, the State of Maine, through its Legislature, ought to be free to set public policy to determine whether harm should be part of the analysis.

---

LEVY, J., with whom ALEXANDER, J., joins, dissenting.

[¶59] The Court's desire to announce new standards for evaluating claims of de facto parenthood is understandable given the concept's recent development and the absence of legislatively declared public policy. Our prior decisions

provide sufficient guidance, however, for us to conclude that Pitts failed to prove his status as a de facto parent. Accordingly, the District Court's judgment should be vacated on that basis, and this case should not be remanded for additional proceedings. Further, the new standards announced by the Plurality do not sufficiently account for the constitutionally protected interests at stake, do not achieve the Plurality's stated purpose of clarifying the law, and are not required to fully and fairly decide this appeal. For these reasons, I respectfully dissent.

[¶60] I proceed by (A) addressing the constitutional requirement that a person seeking rights as a de facto parent demonstrate that the child would suffer harm if the person is not awarded parental rights, (B) critiquing the new standards announced by the plurality opinion regarding de facto parenthood, and (C) explaining why, under our existing precedent, Pitts failed to prove his status as a de facto parent.

A. The Constitutional Requirement of Harm

[¶61] When a state court entertains a complaint seeking a declaration of de facto parenthood, it engages in state action that implicates the constitutionally protected liberty interest a parent has in parenting his or her child free from state interference. *See* U.S. Const. amend. XIV, § 1; Me. Const. art. I, § 6-A; *Davis v. Anderson*, 2008 ME 125, ¶¶ 11, 18, 953 A.2d 1166 (citing *Troxel v. Granville*,

530 U.S. 57, 65 (2000) (plurality opinion)).[21] This facet of individual liberty protected by the Fourteenth Amendment "is perhaps the oldest of the fundamental liberty interests recognized." *Troxel*, 530 U.S. at 65. "[I]t cannot now be doubted that the Due Process Clause of the Fourteenth Amendment protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children." *Id.* at 66. To protect this fundamental right, courts recognize "'a presumption that fit parents act in the best interests of their children,'" including with respect to requests for third-party visitation or parental rights. *Guardianship of Jewel M.*, 2010 ME 80, ¶ 4, 2 A.3d 301 (quoting *Troxel*, 530 U.S. at 68); *see also Davis*, 2008 ME 125, ¶¶ 12-16, 953 A.2d 1166. Further, any state interference with this right must be narrowly tailored to serve a compelling state interest. *Davis*, 2008 ME 125, ¶¶ 11-13, 19, 953 A.2d 1166.

[¶62] As recognized in our cases involving termination of parental rights, grandparent visitation, and guardianships, a compelling state interest requires a

---

[21] In *Troxel*, a nonparent visitation case, the Supreme Court's plurality opinion did not reach the question of to what extent harm must be shown for a court to override a parent's decision regarding third-party visitation:

> Because we rest our decision on the sweeping breadth of [the visitation rights statute] and the application of that broad, unlimited power in this case, we do not consider the primary constitutional question passed on by the Washington Supreme Court—whether the Due Process Clause requires all nonparental visitation statutes to include a showing of harm or potential harm to the child as a condition precedent to granting visitation. We do not, and need not, define today the precise scope of the parental due process right in the visitation context.

*Troxel v. Granville*, 530 U.S. 57, 73 (2000) (plurality opinion).

showing of some degree of harm or the threat of harm to the child before a court may interfere with the parental rights of a presumptively fit parent. *See Guardianship of Jeremiah T.*, 2009 ME 74, ¶¶ 27-28, 976 A.2d 955 (recognizing that, because of the fundamental liberty interest at stake, a guardianship may only be maintained over a parent's objection based on a showing of parental unfitness); *In re Jazmine L.*, 2004 ME 125, ¶¶ 12, 14-15, 861 A.2d 1277 (addressing when serious harm or the threat of serious harm to a child may justify a finding of parental unfitness for purposes of terminating parental rights); *Rideout v. Riendeau*, 2000 ME 198, ¶ 24, 761 A.2d 291 ("'The natural right of a parent to the care and control of a child should be limited only for the most *urgent reasons*.'" (quoting *Merchant v. Bussell*, 139 Me. 118, 122, 27 A.2d 816 (1942))); *see also* 18-A M.R.S. § 5-204(c) (2013) (permitting the court to appoint a guardian for a minor, absent consent of the minor's parents, if "a living situation has been created that is at least temporarily intolerable for the child"); 22 M.R.S. § 4003(2) (2013) (authorizing the State to remove children from the custody of their parents "only where failure to do so would jeopardize their health or welfare"). Consistent with this precedent, the foundation for the judicially created concept of de facto parenthood is that courts may interfere with a parent's lawful right to prevent his or her child from having a relationship with a person seeking de facto parent status only if "'measurable harm would befall the child on the disruption of that

relationship.'" *A.H. v. M.P.*, 857 N.E.2d 1061, 1069 (Mass. 2006) (quoting *Care & Protection of Sharlene,* 840 N.E.2d 918, 926 (Mass. 2006)); *see also Blixt v. Blixt,* 774 N.E.2d 1052, 1060-61 (Mass. 2002).

[¶63]   Although we have not previously formulated a single standard to measure the degree of harm needed to pass constitutional muster, both our precedent and the relevant statutes demonstrate that the adverse consequences must be sufficiently serious that the child's long-term physical, emotional, or developmental well-being will be threatened if de facto parenthood status is not awarded.  This view is in harmony with the "urgent reasons" standard applied in *Rideout* and *Merchant*.  *See Rideout*, 2000 ME 198, ¶¶ 22-27, 761 A.2d 291; *Merchant*, 139 Me. at 122, 27 A.2d 816.  What was "urgent" in both cases was the "dramatic, and even traumatic, effect upon the child's well-being" that would follow from a parent's decision to sever that child's relationship with grandparents who had functioned as "primary caregiver[s] and custodian[s] for [the] child over a significant period of time."  *Rideout*, 2000 ME 198, ¶¶ 26-27, 761 A.2d 291 (quotation marks omitted); *see Merchant*, 139 Me. at 119-20, 122-24, 27 A.2d 816.  Thus, an "urgent reason" that may justify state interference with a decision usually within the sole discretion of a fit parent is the need to prevent harm to the child.  Maine is not alone in requiring proof of harm.  Numerous other jurisdictions also

44

require a showing of harm or the threat of harm to the child before a court may

award contact or parental rights over the objection of a fit parent.[22]

[22] *See, e.g.*, *Fenn v. Sherriff*, 1 Cal. Rptr. 3d 185, 201 (Cal. Ct. App. 2003) (holding that a court may award custody to a third party, absent a showing of parental unfitness, "based on a clear showing that such award is essential to avert harm to the child" (quotation marks omitted)); *DiGiovanna v. St. George*, 12 A.3d 900, 908 (Conn. 2011) ("[T]he court constitutionally may compel a parent to preserve a relationship between a child and a third party, even in the face of strong parental opposition, when the cessation of that relationship would cause substantial harm to the child."); *Beagle v. Beagle*, 678 So. 2d 1271, 1276 (Fla. 1996) (holding that a statute imposing grandparental visitation rights over the objection of at least one parent was unconstitutional because it did not require the state to demonstrate harm to the child prior to the award of visitation rights); *Clark v. Wade*, 544 S.E.2d 99, 108 (Ga. 2001) (interpreting the best interest standard of a parent-third party custody statute to require that the third party prove by clear and convincing evidence that "the child will suffer physical or emotional harm if custody were awarded to the biological parent"); *Doe v. Doe*, 172 P.3d 1067, 1079-80 (Haw. 2007) ("[P]roper recognition of parental autonomy in child-rearing decisions requires that the party petitioning for visitation demonstrate that the child will suffer significant harm in the absence of visitation . . . ."); *In re R.L.S.*, 844 N.E.2d 22, 30 (Ill. 2006) ("State interference with fundamental parental child-rearing rights is justified in limited instances to protect the health, safety, and welfare of children."); *In re Marriage of Howard*, 661 N.W.2d 183, 191 (Iowa 2003) (holding that a state may only compel grandparent visitation if there is "a showing of harm to the child beyond that derived from the loss of the helpful, beneficial influence of grandparents"); *Gill v. Bennett*, 82 So. 3d 383, 390 (La. Ct. App. 2011) (holding that custody may only be awarded to a nonparent if parental custody would result in substantial harm to the child); *A.H. v. M.P.*, 857 N.E.2d 1061, 1071 (Mass. 2006) ("[P]otential harm to the child is, of course, the criterion that tips the balance in favor of continuing contact with a de facto parent against the wishes of the fit legal parent, who has fundamental liberty interests in the child's care, custody, and control." (quotation marks omitted)); *Rohmiller v. Hart*, 811 N.W.2d 585, 595 (Minn. 2012) (holding that, to be constitutional, a third-party visitation statute must require the court to conduct more than a mere best interest analysis in order to override a fit parent's wishes); *Locklin v. Duka*, 929 P.2d 930, 934-35 (Nev. 1996) ("[E]xtraordinary circumstances sufficient to overcome the parental preference presumption are those circumstances which result in serious detriment to the child."); *McAllister v. McAllister*, 779 N.W.2d 652, 658 (N.D. 2010) ("When a psychological parent and a natural parent each seek a court-ordered award of custody, the natural parent's paramount right to custody prevails unless the court finds it in the child's best interests to award custody to the psychological parent to prevent serious harm or detriment to the welfare of the child." (quotation marks omitted)); *Neal v. Lee*, 14 P.3d 547, 550 (Okla. 2000) (holding that the trial court's "vague generalization" about the positive effects grandparents have on their grandchildren fell "short of the necessary showing of harm which would warrant the state's interference with this parental decision regarding who may see a child" (quotation marks omitted)); *Clough v. Nez*, 759 N.W.2d 297, 302 (S.D. 2008) (holding that the "extraordinary circumstances" that would justify awarding nonparental visitation rights over a parent's objection must result in serious detriment to the child); *In re Askew*, 993 S.W.2d 1, 4 (Tenn. 1999) ("[A] natural parent may only be deprived of custody of a child upon a showing of substantial harm to the child."); *In re J.C.*, 346 S.W.3d 189, 194-95 (Tex. App. 2011) (recognizing that a child's welfare may be significantly impaired by uprooting the child from a nonparental caretaker); *Craven v. McCrillis*, 868 A.2d 740, 742-43 (Vt. 2005) (recognizing that "compelling circumstances" justifying interference with a parent's visitation decision include proof that "significant harm to the child will result in the absence of a visitation order"); *Florio v.*

[¶64] The jurisprudential basis for awarding a nonparent parental rights is to advance the State's interest in protecting a child from being arbitrarily cut off from an important parental figure with whom the child has developed a significant emotional attachment. As one commentator has observed, "The bond created between a child and a caregiver is called attachment. . . . To ensure continuity of relationships and recognize a child's sense of time, courts must do more to acknowledge legal rights for *long-term* caregivers who are psychological parents but not legal parents." Anna Sortun, Comment, *Rebutting the Parental Presumption in Oregon: Substantiating Emotional Bonds after* Troxel v. Granville, 82 Or. L. Rev. 1191, 1197-98 (2003) (emphasis added).[23]

[¶65] Accordingly, our recent decisions regarding de facto parenthood have all concerned children who had been cared for by a nonparent over a significant period of time of at least five continuous years.[24] *See Leonard v. Boardman*,

---

*Clark*, 674 S.E.2d 845, 847 (Va. 2009) (noting that the law's presumption in favor of awarding custody to a parent may be rebutted by a showing of an "extraordinary reason" for taking a child from the child's parent, among other factors (quotation marks omitted)); *In re Custody of Shields*, 136 P.3d 117, 143 (Wash. 2006) (en banc) ("[P]arental rights may also be outweighed in custody determinations when actual detriment to the child's growth and development would result from placement with an otherwise fit parent.").

[23] "Attachment Theory states that the propensity to form a strong emotional bond to particular caregivers is as fundamental in humans as the attachment behaviors that precede it." Mary Elizabeth Putnick, *The State as Parent: Using Attachment Theory to Develop Child Welfare Policy in the Best Interest of the Child*, 24 N.Y.U. Rev. L. & Soc. Change 419, 423 (1998).

[24] This approach also respects the Legislature's decision to generally limit a nonparent's ability to obtain parental rights and responsibilities absent parental consent, waiver, or circumstances involving jeopardy to the child. *See, e.g.*, 18-A M.R.S. § 9-302 (2013) (articulating the requirements for adoption);

2004 ME 108, ¶ 16, 854 A.2d 869 (eight years); *Philbrook v. Theriault*, 2008 ME 152, ¶ 12, 957 A.2d 74 (nine years); *Young v. Young,* 2004 ME 44, ¶ 2, 845 A.2d 1144 (five years); *C.E.W. v. D.E.W.*, 2004 ME 43, ¶¶ 1-4, 845 A.2d 1146 (nine years); *Stitham v. Henderson,* 2001 ME 52, ¶ 2, 768 A.2d 598 (five years). The temporal aspect of the harm requirement ensures that de facto parent claims are limited to those cases in which it is probable that the child has become psychologically attached to the person claiming de facto parent status. This temporal aspect of harm is recognized by the American Law Institute, *Principles of the Law of Family Dissolution: Analysis and Recommendations* (2002) ("*ALI Principles*"), which defines a de facto parent, in part, as an individual who has lived with the child "for a significant period of time not less than two years." *ALI Principles* § 2.03(1)(c).

B.    The Plurality Opinion's Newly Announced Standards

[¶66]  By recognizing the constitutional requirement of proof of harm, and also requiring clear and convincing evidence that a de facto parent has "undertaken a permanent, unequivocal, committed, and responsible parental role in the child's life," *Philbrook*, 2008 ME 152, ¶ 22, 957 A.2d 74 (quotation marks omitted), the plurality opinion reaffirms the standards that we have previously applied in cases

---

19-A M.R.S. § 1653(2) (2013) (setting forth the court's authority to award parental rights and responsibilities, including to a nonparent); 22 M.R.S. §§ 4002(6), 4035, 4036, 4055 (2013) (governing the procedure for child protection and parental termination orders based on jeopardy and parental unfitness).

involving de facto parents. *See* Plurality Opinion ¶¶ 17, 27. However, the Plurality Opinion goes further by reformulating or adding to these standards in five ways that create uncertainty or unnecessarily lower the bar for demonstrating a compelling state interest that would justify a court in overruling a fit parent's decision regarding what is best for her or his child. As I will discuss in the final part of this opinion, none of these legal pronouncements are necessary to decide this case.

[¶67] First, the Plurality Opinion describes the degree of harm that must be shown as merely "that the child's life would be substantially and negatively affected if the person who has undertaken a permanent, unequivocal, committed, and responsible parental role in that child's life is no longer permitted to do so." Plurality Opinion ¶ 29. Whether a child's interests would be "negatively affected" by the denial of a nonparent's request for a declaration of de facto parent status is simply a different way of asking whether an award of de facto parent status to a nonparent would be in the best interest of the child. The Plurality Opinion's "negative effect" standard is vague and possibly unconstitutional given the United States Supreme Court's conclusion in *Troxel* that the best interest of the child standard is constitutionally insufficient to support judicial interference with a parent's rights. 530 U.S. at 67-73.

48

[¶68]   Second, the Plurality Opinion does not recognize any minimum temporal requirement for de facto parenthood, whether the two-year requirement established by *ALI Principles* § 2.03(1)(c) or a longer period as reflected in our prior decisions. The Plurality Opinion thus deemphasizes the requirement that, for a court to review a fit parent's decision to exclude a nonparent from the child's life, it must be shown that the nonparent acted as a "primary caregiver and custodian for [the] child over *a significant period of time*." *Rideout*, 2000 ME 198, ¶ 27, 761 A.2d 291 (emphasis added) (quotation marks omitted).

[¶69]   Third, the Plurality Opinion distinguishes "parenting functions" from "caretaking functions," and suggests that proof of the latter is required to establish a de facto parent/child relationship. Plurality Opinion ¶ 28. In so doing, the Plurality Opinion embraces a distinction made in *ALI Principles* § 2.03(1)(c) regarding de facto parents.[25] This approach, however, effectively excludes from

---

[25]   *ALI Principles* § 2.03(1)(c) provides:

> A *de facto parent* is an individual other than a legal parent or a parent by estoppel who, for a significant period of time not less than two years,
>
> (i) lived with the child and,
>
> (ii) for reasons primarily other than financial compensation, and with the agreement of a legal parent to form a parent-child relationship, or as a result of a complete failure or inability of any legal parent to perform caretaking functions,
>
>> (A) regularly performed a majority of the caretaking functions for the child, or
>>
>> (B) regularly performed a share of caretaking functions at least as great as that of the parent with whom the child primarily lived.

de facto parenthood those individuals who might not qualify as de facto parents pursuant to *ALI Principles* § 2.03(1)(c) but would otherwise qualify as "parents by estoppel" pursuant to § 2.03(1)(b).[26] As the Massachusetts Supreme Judicial Court has recognized, under the *ALI Principles*, only a parent by estoppel, and not a de facto parent, "'is afforded all of the privileges of a legal parent.'" *A.H. v. M.P.*, 857 N.E.2d 1061, 1073 (Mass. 2006) (quoting *ALI Principles* § 2.03 cmt. b). In contrast, under the approach adopted by the Plurality Opinion, only a de facto parent is afforded all the privileges of a legal parent. The Plurality Opinion's approach leaves the state of our law confused in relation to both the law of

---

[26] *ALI Principles* § 2.03(1)(b) provides:

A *parent by estoppel* is an individual who, though not a legal parent,

(i) is obligated to pay child support under Chapter 3; or

(ii) lived with the child for at least two years and

   (A) over that period had a reasonable, good-faith belief that he was the child's biological father, based on marriage to the mother or on the actions or representations of the mother, and fully accepted parental responsibilities consistent with that belief, and

   (B) if some time thereafter that belief no longer existed, continued to make reasonable, good-faith efforts to accept responsibilities as the child's father; or

(iii) lived with the child since the child's birth, holding out and accepting full and permanent responsibilities as parent, as part of a prior co-parenting agreement with the child's legal parent (or, if there are two legal parents, both parents) to raise a child together each with full parental rights and responsibilities, when the court finds that recognition of the individual as a parent is in the child's best interests; or

(iv) lived with the child for at least two years, holding out and accepting full and permanent responsibilities as a parent, pursuant to an agreement with the child's parent (or, if there are two legal parents, both parents), when the court finds that recognition of the individual as a parent is in the child's best interests.

50

Massachusetts, on which the plurality opinion is ostensibly based, and the *ALI Principles*.

[¶70]   Fourth, in defining what it means for a parent to have "a permanent, unequivocal, committed, and responsible parental role in the child's life," Plurality Opinion ¶ 27 (quotation marks omitted), the Plurality Opinion quotes and adopts the definition of de facto parenthood expressed by the Massachusetts Supreme Judicial Court in *E.N.O. v. L.M.M.*:

> A de facto parent is one who has no biological relation to the child, but has participated in the child's life as a member of the child's family.   The de facto parent resides with the child and, with the consent and encouragement of the legal parent, performs a share of caretaking functions . . . .

711 N.E.2d 886, 891 (Mass. 1999).   This excerpt quoted in the Plurality Opinion noticeably excises the last portion of the second sentence, which reads in its entirety:   "The de facto parent resides with the child and, with the consent and encouragement of the legal parent, performs a share of caretaking functions *at least as great as the legal parent*."   *Id.* (emphasis added).[27]   The Massachusetts Supreme Judicial Court reiterated its adherence to this requirement in *A.H. v. M.P.*, 857 N.E.2d at 1070, and thus applies a standard that is more rigorous than the partial excerpt of the standard cited by the Plurality Opinion.   The Plurality

---

[27]   This statement of the required proof encapsulates the requirement set out in *ALI Principles* § 2.03(1)(c).   *See supra* n.25.

Opinion effectively relaxes the Massachusetts standard, explaining in a footnote that "[a]t this juncture, we do not set the bar so high for this portion of the de facto parenthood standard," Plurality Opinion n.14, but offers no explanation as to why a less demanding approach is sound policy for Maine.

[¶71]  Finally, without explanation, the Plurality Opinion adopts the less stringent preponderance of the evidence burden of proof, rather than the more demanding clear-and-convincing-evidence burden of proof, for purposes of determining the child's best interest.  Plurality Opinion ¶¶ 37-38.  Proof of the child's best interest to the standard of clear and convincing evidence is required, however, in order to narrowly tailor the extent to which the judicial process interferes with a parent's fundamental liberty interest in parenting his or her child. *See Davis*, 2008 ME 125, ¶¶ 11-13, 19, 953 A.2d 1166; *In re Amanda H.*, 2007 ME 43, ¶ 3, 917 A.2d 1120  ("A court may not enter an order terminating parental rights in the absence of an explicitly stated finding, by clear and convincing evidence, that termination is in the best interest of the child." (quotation marks omitted)).  In addition, the Plurality Opinion divorces the best interest determination from the threshold question of whether a nonparent should be declared a de facto parent in the first instance.  *See* Plurality Opinion ¶¶ 37-38. Thus, a nonparent who may have had a permanent, unequivocal, committed, and responsible parental role in the child's life in the past, but whose continued

presence in the child's life will be detrimental to the child, may nonetheless be entitled to a declaration of de facto parenthood.

[¶72] Defining de facto parenthood is a delicate task that should be preceded by a searching evaluation of the competing child welfare, family preservation, and related public policy issues that are involved. This is reflected both in the *ALI Principles* and in the Maine Legislature's ongoing consideration of these very questions. *See* Resolve 2013, ch. 12, § 2 (noting that "Maine law may require clarification and updating with regard to issues relating to parental rights and responsibilities" when factual parentage is uncertain, and extending the date by which the Family Law Advisory Commission must report to the Legislature regarding its study of the Uniform Parentage Act and other similar laws and proposals). Thus, there exist sound reasons for the Court to exercise restraint and not announce new standards governing de facto parenthood, particularly where those standards are not required to fairly and fully adjudicate this appeal.

C.    Proof of De Facto Parenthood in this Case

[¶73] By drawing from the existing standards employed in our prior decisions, we can and should conclude that Pitts failed to establish that he is a de facto parent for the following reasons.

[¶74] Pitts resided with Moore and the child from the child's birth in November 2009 until November 2010. Accounting for a one-month period of

separation between Moore and Pitts, Pitts resided with the child for approximately eleven months. This is far less than the two years required by the *ALI Principles* and the five or more years at issue in our recent decisions. Further, based on the court's findings, Pitts failed to prove that he acted as the child's primary caregiver during those eleven months, much less for a significant period of time.

[¶75] In addition, Pitts otherwise failed to prove that the child would suffer harm or the threat of harm if Moore stands by her decision to restrict her son's relationship with him. The trial court recognized this deficiency when it concluded that it could not quantify or characterize the adverse effect of denying visitation to Pitts. Moreover, the court expressly declined to award Pitts parental rights and responsibilities beyond limited rights of contact, stating that Pitts "failed to demonstrate by clear and convincing evidence that any award of parental rights and responsibilities (decision making or any type of residential care) is in the best interest of the child." One is hard-pressed to understand why a person found to be unsuited for parental responsibilities should qualify as a child's de facto parent.

[¶76] There is nothing in the evidentiary record of this case that calls for the adoption of new de facto parent standards that are so malleable as to support an award of parental rights and responsibilities to Pitts. This child custody litigation should be brought to an end. I would vacate the trial court's judgment and remand for entry of a judgment in favor of Moore.

**On the briefs:**

Ronald D. Bourque, Esq., and Bradley C. Morin, Esq., Bourque & Clegg, LLC, Sanford, for appellant Amanda Moore

Amy L. Fairfield, Esq., and Mark J. Peltier, Esq., Fairfield & Associates, P.A., Lyman, for appellee Matthew Pitts

**At oral argument:**

Bradley C. Morin, Esq. for appellant Amanda Moore

Amy L. Fairfield, Esq., for appellee Matthew Pitts

Springvale District Court docket number FM-2011-00245
FOR CLERK REFERENCE ONLY